### KELLY v. UNITED STATES.
#### No. 48853.

United States Court of Claims.
June 5, 1950.
Writ of Certiorari Denied Oct. 16, 1950.

Madden, J., and Jones, C. J., dissented.

Robert F. Klepinger, Washington, D. C., for the plaintiff. Grover C. Thompson, Jr., and Grover C. Thompson, Lexington, Ky., were on the brief.

J. J. McGinty, New York City, with whom was H. G. Morrison, Assistant Attorney General, for the defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

WHITAKER, Judge.

The plaintiff submitted a sealed competitive bid to supply milk and other dairy requirements to the Government's Veterans' Administration Hospital at Lexington, Kentucky, for the period May 15, 1946, through June 30, 1947. The bids were to be opened on April 30, 1946. In the standard government form on which the bids were submitted was paragraph 6,[1] providing for an increase or decrease in the bid price if taxes or charges were increased or decreased by Congress after the bid was submitted.

When the bids were read on April 30, one of the plaintiff's competitor's bids was read first. That bidder had stamped on his bid the following statement: "The above prices will be adjusted upward or downward in the same amount of any adjustment in the ceiling prices on the same date." The reading of that bid brought up a discussion as to whether paragraph 6 of the standard form would apply to an adjustment of prices by the Office of Price Administration. The Chairman of the Board of Awards said that it was his opinion that it would. The plain-

---

1. "6. Prices bid herein include any Federal tax heretofore imposed by the Congress which is applicable, to the material on this bid. If any sales tax, processing tax, adjustment charge, or other taxes or charges are imposed or changed by the Congress after the date set for the opening of this bid, and made applicable directly upon the production, manufacture, or sale of the supplies covered by this bid, and are paid by the contractor on the articles or supplies herein contracted for, then the prices named in this bid will be increased or decreased accordingly, and any amount due the contractor as a result of such change will be charged to the Government and entered on vouchers (or invoices) as separate items."

tiff's bid, containing no qualifying statement, was read next, and then the bid of the third bidder was read which had a qualifying statement similar to the one contained in the bid first read.

The plaintiff was awarded the contract, the Government's Certificate of Award being executed on May 13. The plaintiff was not the low bidder, but was the lowest bidder whose facilities were regarded as satisfactory by the Board of Awards.

On June 7, 1946, O.P.A. ceiling prices were increased on some of the commodities covered by the contract. The plaintiff notified the hospital that prices would be increased accordingly. He was requested to itemize the increases and include them in his monthly bills. He did so, and his bills were paid as submitted until June 1, 1947. But from the plaintiff's bill for June, 1947, all these increases included in former bills were deducted, amounting to $3,292.75. The plaintiff submitted a claim for this amount, which was denied by the Comptroller General of the United States.

■ The plaintiff contends that paragraph 6 of the contract gave it the right to add the O.P.A. increases in ceiling prices to the amount of its bid. We do not think it did.

In this paragraph the parties undertook to take care of an increase or decrease in taxes. The first sentence reads: "Prices bid herein include any Federal tax heretofore imposed by the Congress which is applicable to the material on this bid." It then proceeds: "If any sales tax, processing tax, adjustment charge, or other taxes or charges are imposed or changed by the Congress after the date set for the opening of this bid, and made applicable directly upon the production, manufacture, or sale of the supplies covered by this bid, and are paid by the contractor on the articles or supplies herein contracted for, then the prices named in this bid will be increased or decreased accordingly, and any amount due the contractor as a result of such change will be charged to the Government and entered on vouchers (or invoices) as separate items."

The Government's contracting officer drew this bid form. By it he directed the bidder to include in his price any Federal tax previously imposed by the Congress on the material included in the bid, but he said to him that if Congress thereafter should change the tax applicable to the material in the bid, the amount bid would be changed accordingly.

There would be no doubt at all in the mind of any one that the whole paragraph related to taxes except for the fact that the expression "adjustment charge" was used. But even though this expression might be somewhat ambiguous to a layman, we think a lawyer would naturally construe it in connection with its context, and its context clearly was taxes.

By the use of this expression we think the Government intended an adjustment charge affecting a tax; for instance, an adjustment in the valuation of property upon which a tax is levied. This would be such an adjustment charge as was in the minds of the parties who drew paragraph 6. The contracting officer in asking for bids according to the requirements of paragraph 6 had in mind an adjustment charge which affected tax liability.

■ However, it may be admitted that a layman reading this language might not understand that the expression, "adjustment charge," was confined to an adjustment relating to taxes, and the bidders asked the question whether or not an adjustment in ceiling prices by the O.P.A. came within the terms of this paragraph. The Chairman of the Board of Awards said that in his opinion it did come within its provisions.

Had this expression of opinion been made by one who was authorized to enter into a contract on behalf of the Government, we would be inclined to say that the plaintiff was entitled to rely upon it and, hence, that the Government would be bound by it. However, the plaintiff has not shown that the Chairman of the Board of Awards was authorized to express an opinion as to the meaning of this provision.

We have found as a fact in finding 2 that "there is no evidence that the Chairman [of the Board of Awards] had any authority, or represented that he had any, to alter the language of paragraph 6." In finding

3 we said that the *contracting officer* "made no statements, had no conversations and gave no assurances to the plaintiff or his agents, relative to the contract, before it was entered into." The contracting officer is the person clothed with authority by the Government to enter into a contract on its behalf. He drew the form of bid which plaintiff was required to execute. This bid contained paragraph 6. He did not express any opinion as to the meaning of paragraph 6, and it is not shown that he delegated any authority to do so to the Chairman of the Board of Awards. So far as the record shows, this board had authority merely to receive bids and to award the contract, and it was authorized to award the contract only to such person as had bid according to the requirements laid down by the contracting officer.

■ Before a plaintiff is entitled to rely upon any statement made by a Government agent he must show that this agent had the authority to make the statement.

As long ago as Hawkins v. United States, 96 U.S. 689, 691, 24 L.Ed. 607, the Supreme Court said that persons dealing with the Government must take notice of the extent of the authority it had given its agents, and that the Government is not bound by their declarations unless it appears that they had the authority to make them. In that case the court said:

"Individuals as well as courts must take notice of the extent of the authority conferred by law upon a person acting in an official capacity; and the rule applies, in such a case, that ignorance of the law furnishes no excuse for any mistake or wrongful act. State ex rel. etc. v. Hayes, [Hays], 52 Mo. 578; Delafield v. The State of Illinois, 26 Wend. (N.Y.) 91 [192]; The People v. The Phoenix Bank, 24 id. [Wend.] 430 [431, 35 Am.Dec. 634]; The Mayor and City Council of Baltimore v. Reynolds, 20 Md. 1 [83 Am.Dec. 535]; Whiteside v. United States, 93 U.S. 247 [23 L.Ed. 882].

"Different rules prevail in respect to the acts and declarations of public agents from those which ordinarily govern in the case of mere private agents. Principals in the latter category are in many cases bound by the acts and declarations of their agents, even where the act or declaration was done or made without any authority, if it appear that the act was done, or the declaration was made, by the agent in the course of his regular employment; *but the government or public authority is not bound in such a case, unless it manifestly appears that the agent was acting within the scope of his authority, or that he had been held out as having authority to do the act, or make the declaration, for or on behalf of the public authorities.* Story, Agency, 307a; Lee v. Munroe, 7 Cranch 366 [3 L.Ed. 373]" [Italics ours.]

Plaintiff has not shown that the Chairman of the Board of Awards was acting within the scope of his authority in interpreting paragraph 6 nor is it shown that he was held out as having authority to do so.

Much later, in Federal Crop Insurance Corporation v. Merrill, 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10, 175 A.L.R. 1075, the Supeme Court reiterated the declaration of the Hawkins case, supra, when it said: "Whatever the form in which the Government functions, anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority. The scope of this authority may be explicitly defined by Congress or be limited by delegated legislation, properly exercised through the rule-making power. And this is so even though, as here, the agent himself may have been unaware of the limitations upon his authority. See, e. g., Utah Power & Light Co. v. United States, 243 U.S. 389, 409, 37 S.Ct. 387, 391, 61 L.Ed. 791; United States v. Stewart, 311 U.S. 60, 70, 61 S.Ct. 102, 108, 85 L.Ed. 40, and see, generally, The Floyd Acceptances, 7 Wall. 666, 19 L.Ed. 169."

In the case last cited there were the same appealing considerations as in the case at bar. There a wheat farmer applied for insurance to the Bonneville County Agricultural Conservation Committee, which was acting as the agent for the Federal Crop Insurance Corporation. He advised this committee he was planting 460 acres of spring wheat and that on 400 of them he

was reseeding on winter wheat acreage. The committee advised the applicant that the entire crop was insurable, and it forwarded the application for insurance to the Denver office of the corporation, and that office accepted the application.

Notwithstanding this statement of the committee that the entire crop was insurable, and notwithstanding the acceptance of the application by the corporation, the court held that the plaintiff was not entitled to recover because the committee was not authorized to make the statement that the entire crop was insurable, the regulations being to the contrary.

The court recognized that it was a hard case, but it nevertheless denied recovery.

In Munro v. United States, 303 U.S. 36, 41, 58 S.Ct. 421, 82 L.Ed. 633, a veteran of the First World War undertook to bring suit on an insurance policy. He was advised by the United States Attorney that he might file his summons within the statutory period and later follow it with his petition. Acting upon this advice he filed his summons within the statutory period, but did not file his petition until after the statute had run. The Supreme Court held that the statute required the filing of the petition within the statutory period and that the veteran was not entitled to rely upon the statement of the United States Attorney that the filing of the summons was sufficient and that his suit was accordingly barred. See also Utah Power & Light Co. v. United States, 243 U.S. 389, 408–409, 37 S.Ct. 387, 61 L.Ed. 791; Sutton v. United States, 256 U.S. 575, 578–579, 41 S.Ct. 563, 65 L.Ed. 1099, 19 A.L.R. 403; Wilber National Bank v. United States, 294 U.S. 120, 123-124, 55 S.Ct. 362, 79 L.Ed. 798.

We are of the opinion that paragraph 6 of the bid was not intended to relate to an adjustment in ceiling prices by the Office of Price Administration, and that plaintiff was not entitled to rely upon the expression of opinion of the Chairman of the Board of Awards that it did cover such an adjustment and, therefore, he is only entitled to the price stated in his bid.

This may seem to be a harsh conclusion, but it is one required not only by law but by logic when we recollect that the Government has hundreds of thousands of employees and that it would be disastrous to hold it liable for their expressions of opinion unless it is shown the Government had held them out as being authorized to give opinions.

The deduction made from plaintiff's bill for June 1947 was proper, and he is not entitled to recover. His petition will be dismissed.

HOWELL, and LITTLETON, Judges, concur.

MADDEN, Judge (dissenting).

I do not agree with the Court's decision. The plaintiff contends that paragraph 6 of the contract gave it the right to add the O.P.A. increases to its bid prices. I think that, in the circumstances in which the contract was made, it did give the plaintiff that right. The plaintiff inquired whether paragraph 6 authorized such an adjustment and was told by the Chairman of the Board of Awards, who was speaking for the Government, that it did. The minds of the parties met on that basis, and the formal contract was later executed, still on that basis. The fact that the Chairman further said that "if any question came up in the future, if they wanted information about which we didn't have, we'd submit the question to Washington for decision" seems irrelevant. The plaintiff had no question, and no duty to raise any question. He was satisfied with the interpretation placed upon the language of the contract by the other party to the contract.

The Comptroller General of the United States, in his denial of the plaintiff's claim quoted in our finding 6, said: "In determining the intention of the parties to a written contract, the question is not what intention may have existed in the minds of the parties, but what intention is expressed by them in language used in the writing." I think that to make this statement correct as a statement of the law applicable to a specific case, in which both parties intended the same thing, the language used would have to be very plain and unambiguous, certainly much more so than the language of para-

graph 6 here in question. And even if the language used were perfectly plain and unambiguous, and the parties through mutual ignorance of the meaning of plain language said what neither one meant, the contract would be reformed to express their agreed meaning.

Paragraph 6 is not a statute. It is, in any particular case such as this, merely the language which parties have used in making a contract. If it has a plain meaning to some one "in Washington", it obviously did not have that plain meaning to this plaintiff dairyman in Kentucky, because he inquired what it meant. And it meant plainly to the Government Agent who had been stationed in Kentucky to, *inter alia,* make contracts for the Government, the very opposite of what it was later said to mean "in Washington". All of this seems to me to show that it was at least ambiguous enough to mean what the parties agreed that it meant, viz., that if prices were increased by the O.P.A. and the plaintiff paid those increases, its bid prices to the Government would be increased accordingly.

The Government urges that, under the provisions of Veterans' Administration Regulations M11–200, the plaintiff could not have withdrawn his bid if he had received an adverse answer to his inquiry as to the meaning of paragraph 6, hence he was not misled by the favorable answer which he did receive, and hence cannot have the advantage of it.

The law of contracts is that an offer not under seal, and not made for a consideration, is revocable until it is accepted. The Government frequently requires irrevocable bids, their irrevocability being guaranteed by a bid bond. In this case there was no such requirement. It is not explained to us how Regulations M11–200 would be binding upon the plaintiff, a dairyman in Kentucky who had never heard of them. Even if they were, they would not change the meaning of the language of a contract made by parties who were in complete agreement as to its meaning.

The Court's conclusion is based upon the proposition that the Chairman of the Board of Awards was not shown to have been given authority to alter the language of paragraph 6. He did not, of course, alter or purport to alter it. He only stated what it meant. Someone was required to say what the Government meant by language which it used which did not have a plain meaning. If the Government man with the imposing title, Chairman of the Board of Awards, did not even have authority to tell a milkman what certain words in a contract which he was sitting to award meant, he constituted a trap for the plaintiff and caught him. If his role was to say nothing, because he didn't know enough to talk, he should have been told to keep quiet and not entrap innocent citizens.

The cases relied on in the Court's opinion are not apposite. In Hawkins v. United States, 96 U.S. 689, 24 L.Ed. 607, the plaintiff's claim rested upon an attempted clear variation of the contract by a subordinate official, when the contract expressly provided that it could not be varied except with the written consent of the Secretary of the Treasury. In Federal Crop Insurance Corporation v. Merrill, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10, 175 A.L.R. 1075, the plaintiff sued upon a crop insurance policy, the acceptance of the application for which had expressly stated that it was made subject to the regulations of the Federal Crop Insurance Corporation. The regulations, published in the Federal Register and having the force of law, made the plaintiff's crop uninsurable. In Munro v. United States, 303 U.S. 36, 58 S.Ct. 421, 82 L.Ed. 633, the plaintiff, relying upon a statement by the United States District Attorney, neglected to file his petition until after his claim was barred by the statute of limitations.

Of course none of these cases lends any support to a holding that an agent authorized by the Government to invite bids and award contracts, does not have authority to explain to lay bidders the meaning of nonstatutory, ambiguous language in the proposed contract. If that is the law, another uncertainty is added to the status of a contractor with the Government, for which added uncertainty the Government will, of course, pay dearly in the long run in the additions which bidders must make to otherwise fair prices as insurance against un—

anticipated interpretations of their contracts.

The Court does not find that the contracting officer intended the words in question to mean anything different from what the Chairman of the Board of Awards told the plaintiff they meant. It is hard to imagine anything more irrelevant than the Court's statement that the words would have meant something different to a lawyer. The only man who spoke for the Government must not have been a lawyer, since he did not read the words as the Court says a lawyer would have read them. The plaintiff was a milkman.

The Government should treat its citizens fairly. It has not done so in this case.

JONES, Chief Judge, agrees with this dissent.