**CHALKER & LUND CO. v.
UNITED STATES.**

No. 47694.

United States Court of Claims.

Decided Oct. 7, 1952.

The plaintiff, as the construction contractor, computed its bid for fine grading a fill to be placed by another contractor on the site of a Government construction project in anticipation that sand would be used as the fill material. The fill that was actually placed consisted largely of a high content limestone material, which became quite hard when it dried, resulting in costs to plaintiff in excess of those anticipated for fine grading a sand fill, which plaintiff contends was required by the contract. Plaintiff sues the Government for the excess costs.

The defendant contends that use of the limestone fill was within the specifications to the contract, and that plaintiff was charged with notice that it was to be used.

Plaintiff sues also for recovery of certain lumber costs, relying upon an oral agreement with the defendant's area engineer, which purported to modify plaintiff's contract with the Government. Defendant contends that the agreement was not binding upon the Government because the area engineer had no authority to make such agreement, and because there was no consideration therefor. Defendant also disputes plaintiff's version of the agreement.

The court, having considered the evidence, the report of Commissioner Wilson Cowen, the briefs, and argument of counsel, makes the following

## Special Findings of Fact

1. The plaintiff is a Florida corporation, which is engaged in the construction business and has its principal place of business in West Palm Beach, Florida.

2. Pursuant to a bid and negotiations subsequent thereto, plaintiff entered into a written contract with defendant, acting through Major L. E. Reed of the Corps of Engineers as contracting officer, under date of March 26, 1943, whereby plaintiff agreed to furnish the material and to perform the work for the construction of six general warehouses, an airfoil warehouse, a paint, oil, and dope warehouse, and one repair building at the Army Air Forces Supply and Engine Overhaul Depot, 36th Street Airport, Miami, Florida. The contract, which is in evidence as plaintiff's exhibit 1, contained the standard provisions usually included in Government construction contracts regarding Changes (Article 3), Changed Conditions (Article 4), Extras (Article 5) and Disputes (Article 15).

## First Cause of Action

3. The invitation for bids issued by the U. S. Engineer Office, Jacksonville, Florida, contained the following provisions:

"X. Equipment: Quotations shall state the character and amount of equipment that the individual or firm proposes to employ on the work. After his Quotations are received, any Prospective Contractor may be required to show that he owns, controls by firm option, or can procure the equipment necessary for commencing, prosecuting, and completing the work as required by the specifications.

\* \* \* \* \* \*

"XII. Investigation of conditions: Bidders are expected to visit the locality of the work and acquaint themselves with all available information concerning the nature of materials to be excavated from structure excava-

tions and the local conditions bearing on transportion [sic], handling and storage of materials. They are also expected to make their own estimates of the facilities needed, difficulties in attending the execution of the proposed contract, including local conditions, availability of labor, water, electric power, roads, uncertainties of weather, and other contingencies. In no event will the Government assume any responsibility whatever for any interpretation, deduction, or conclusions drawn from examination of the site. At the bidder's request, a representative of the Government will point out the site of the proposed operations. Failure to acquaint himself with all available information concerning these conditions will not relieve the successful bidder from responsibility for properly estimating the difficulties and costs of successfully performing the work."

4. The standard specifications, which accompanied the invitation for bids, provided for masonry sidewall construction with cement slab floors, four inches thick, poured directly on the established grade. The specifications also provided as follows:

"2-01. *Scope.*—The contractor shall perform all work of clearing, excavating, filling, backfilling, and grading required in connection with the construction of the buildings and appurtenant structures, including the utilities pertaining thereto, as shown or called for on the drawings, unless otherwise modified herein, and in accordance with the requirements of this Section.

"2-02. *General.*—The requirements of this Section are based upon the assumption that the existing ground is level over each building site and that finished grade will be natural grade over the entire building site. Should the ground not be level, or should the contracting officer establish floor elevations or finished grades different from those called for herein, or should the contracting officer order footings excavated to a greater or less depth than specified below, an order for changes will be issued in accordance with the

contract articles, providing for an equitable adjustment in the amount due under the contract.

\* \* \* \* \* \*

"2-07. *Backfill and fill.*

\* \* \* \* \* \*

"(b) Fill under the concrete floor slabs shall be free of loam or organic materials.

"(c) The area covered by concrete floor slabs and the areas of dirt floors shall be thoroughly compacted by puddling, tamping, or rolling as necessary, in accordance with good practice, fill to be placed in layers not exceeding six inches.

\* \* \* \* \* \*

"2-08. *Disposal of excess material.*—The contracting officer, upon request, will designate areas to be used for spoil disposal or for borrow."

5. On March 20, 1943, the defendant sent plaintiff a telegram amending the specifications. The telegram stated:

" \* \* \* All earth fill will be placed by others. Building contractor will fine grade fill only."

The change referred to in the telegram was contained in the amended specifications, which were dated March 17, 1943, and provided in part as follows:

"1A-04. *Excavation, filling and grading.*—(a) Rough grading over the building site is covered under another contract, including compaction of the fill, specified as follows:

" 'Buildings having elevated concrete floor slabs on fill, shall have the fill carefully placed to the proper elevation.

" 'Embankments within areas to be covered by concrete floor slabs shall be constructed in the same general manner as those within the flying field graded areas, as directed by the contracting officer. The embankments shall be placed in layers not exceeding six inches, each layer to be compacted by puddling, tamping, or rolling to 100 percent of the maximum density at optimum moisture.'

"(b) Under this contract, the contractor shall complete the grading as

necessary to place the concrete slabs and to construct the foundations, and shall base his quotations upon estimates of the work required to accomplish this, which estimates shall be based upon the contractor's visual inspection of the grading work actually accomplished. No separate payment nor any adjustment of the contract price will be allowed for any grading done under this contract.

"1A–05. *Section III—Concrete work.*—(a) All concrete slabs on earth fill shall be 6 in. thickness."

6. As was indicated by Paragraph 1A–04 of the amended specifications, the area on which the buildings were to be constructed by plaintiff was to be graded and filled by another contractor. On February 19, 1943, the defendant and the Hooper Construction Company entered into a contract which provided for filling and rough-grading the embankments within the area on which plaintiff was to do its work. The specifications of the Hooper contract provided in part as follows:

"3–01. *Description.*—This work shall consist of the excavation of cut sections within areas to be graded; constructing all embankments, removing and satisfactorily disposing of all materials excavated, including such excavation necessary for the drainage ditches, excavation from borrow areas, and all excavating, shaping, and sloping necessary for the construction, preparation, and completion of all embankments, subgrades, shoulders, slopes, and intersections for landing strips, taxiways, aprons, and end zones; all in accordance with these specifications and in conformity with the lines, grades, and typical cross sections shown on the plans, or as directed by the contracting officer. This work shall also include the construction of embankments within the building areas upon which concrete floor slabs are to be placed, in accordance with these specifications and in conformity with the lines and grades on the contract building plans, and as directed by the contracting officer.

"3–02. *Classification.*—(a) *Regular excavation.*—All materials excavated, except borrow and muck, in constructing landing strips, taxiways, aprons, intermediate landing areas, and end zones, shall be classified as "Regular Excavation."

"(b) *Borrow excavation.*—Borrow excavation shall consist of the excavation, and disposal as directed, of suitable and satisfactory earthwork material obtained from spoil banks, on or off the site, at locations indicated on the plans, or as designated, approved, and measured by the contracting officer, to properly construct the embankments, subgrades, and shoulders for landing strips, taxiways, aprons, and end zones, and the embankments within the building areas.

"3–04. *Embankment.*—(a) *Flying field areas.*—All areas upon which embankment is to be placed shall be cleared as elsewhere specified and shall be plowed or otherwise loosened to a depth of six inches and then compacted as specified. The material shall be of a suitable type for satisfactory compaction by the compaction method used. The embankment shall be constructed in successive layers of not more than six inches in thickness after compaction. Each layer shall be compacted and moisture added as specified. Trucks and other hauling equipment shall not track themselves on the embankment, but hauling equipment shall be routed over all sections of the embankment. A road grader shall be used for shaping the surface at any time directed. Embankment loosened after compaction shall be rerolled as directed by the contracting officer at the expense of the contractor. Rock shall not be used in the embankment to the extent that sufficient soil would not be present to fill all voids between the rock particles. When rock and other embankment material are excavated at approximately the same time, the rock shall be incorporated into the outer portion of the embankment and the other material

shall be incorporated under the future paved areas. Sod shall not be placed in the embankment. The contractor shall be responsible for the stability of all embankments and shall replace any portion which, in the opinion of the contracting officer, has become displaced due to carelessness or negligence on the part of the contractor.

"(b) *Building areas.*—Embankments within areas to be covered by concrete floor slabs shall be constructed in the same general manner as those within the flying field graded areas, as directed by the contracting officer. The embankments shall be placed in layers not exceeding six inches, each layer to be compacted by puddling, tamping, or rolling to 100 percent of the maximum density at optimum moisture, determined as specified in paragraph 3–08.

"Material from borrow areas in excess of that required for filling the building area shall be stockpiled immediately adjacent to the building area, as directed by the contracting officer.

"3–05. *Borrow.*—Borrow shall be resorted to when sufficient quantities of suitable material are not available, as herein prescribed, from flying field and drainage excavation, to properly construct the embankments, subgrades and shoulders.

"The borrow material necessary to complete the embankment shall be obtained from "Spoil Banks" within the vicinity of the airport site and indicated on the contract plans to the extent such material is available. Spoil bank areas, from which borrow is taken, shall be furnished by the contractor.

"Borrow material in addition to that obtained from the Spoil Banks required to complete the embankments shall be furnished by the contractor from sources of his own selection, meeting the approval of the contracting officer.

"3–06. *Compaction.*—The surface on which the embankment is placed and each layer of the embankment shall be compacted by rolling with the type of compaction equipment, that in the opinion of the contracting officer, secures the highest degree of compaction for the type of soil encountered.

"Generally, on sandy soils in which the percentage of binder material is small, a 'caterpillar thread' type of tractor weighing not less than seven tons; or a three-wheel steel roller weighing not less than ten tons shall be used. On soils containing a large percentage of fines or binder, a tamping type roller, as approved by the contracting officer, and pulled by a 'caterpillar thread' type tractor at a speed of not more than three miles per hour, shall be used. One or more of the above types of equipment shall be required for compaction on this work.

"Light rolling equipment approved by the contracting officer shall be used in compacting embankments under the areas upon which concrete floor slabs are to be placed."

The drawings attached to the Hooper contract indicated that the borrow material for the fill was to be obtained from an area located about three-quarters of a mile from the project site, but the drawings did not indicate the nature of such borrow material.

7. The soil in and adjacent to the 36th Street Airport in Miami, Florida, consists of a lime rock foundation, technically known as oolite, with an overburden of sand and muck, which varies in depth from 6 inches to 18 inches. The sand overlying the lime rock is a fine sand, which is locally known as ball-bearing sand, because its particles will not adhere. The sand is used for fill in the construction of small buildings but is not suitable as a fill for large buildings unless confined by foundation walls.

The lime rock referred to was observable in spoil banks around drainage canals adjacent to the site of the airport.

8. Plaintiff's bid was submitted on March 24, 1943. Plaintiff's president, Mr. Chalker, who prepared the bid, was familiar with the site and the nature of the soil, because plaintiff had previously performed a contract in the same area. Therefore, plaintiff did not again examine the site until

it received the amendment to the specifications (Paragraph 1A–04), which stated that the bid should be based upon a visual inspection of the grading work actually accomplished. Upon the receipt of the amended specifications, plaintiff sent its superintendent to find the exact location of the buildings and to examine the nature of the fill. With the assistance of defendant's area engineer, plaintiff's superintendent located the area where the buildings were to be constructed and found that the area was level, sandy, and covered with grass, and that no fill had been placed. He reported these facts to plaintiff.

9. The borrow pit from which the Hooper Construction Company obtained the material for the fill was about a mile from the project site. The pit was not opened until March 23, 1943, which was after the date plaintiff's superintendent made a visual inspection of the site. On March 24, 1943, the date plaintiff's bid was submitted, the Hooper Construction Company excavated some of the lime rock from the pit to build a haul road, but it was not until March 27, 1943, that the Hooper Construction Company began placing the lime rock in the fill on the project area.

The construction of the haul road was not a part of the work covered by the Hooper contract and there was no specification or requirement as to the kind of material to be used in the haul road or the source from which it was to be obtained.

10. At the time plaintiff's bid was prepared, the Hooper contract and specifications were on file in the District Engineer's office in Jacksonville, Florida, at which place Mr. Chalker prepared the bid. However, the defendant did not tender the contract to plaintiff for examination, nor did plaintiff make any effort to see the contract or to find out what kind of fill Hooper proposed to place in the building area.

In view of the statement in Paragraph 1A–04 of the specifications that the fill in the building area was to be spread in 6-inch layers and compacted by puddling, tamping, or rolling, and the statement in Paragraph 1A–05 of the specifications that the concrete slabs were to be placed on an earth fill, plaintiff expected that the fill would be of sand. Accordingly, in the preparation of its bid, plaintiff allowed an estimated cost of one-half cent per square foot for fine-grading the sand fill in the building areas. Plaintiff planned to perform the fine-grading by hand labor, using shovels at first and then leveling the fill at the specified elevation with straight edges after the screeds for the concrete slab floors were set in place. This is a method commonly used in fine-grading a sand fill.

As heretofore stated, the specifications required plaintiff to list the machinery and equipment it proposed to use in performing the contract. In submitting the list, plaintiff did not describe any of the heavy equipment or machinery which it had to employ in fine-grading the fill.

11. The material obtained from the borrow pit by the Hooper Construction Company and used to construct the fill in the building areas was composed principally of oolite. The material was excavated from under water and was soft when it was dumped on the fill. However, when the material became dry, it was so hard that it could not be cut with a pick or fine-graded with hand labor as plaintiff had planned. Because of its physical properties, the oolite is used as a base for roads and highways in the Miami, Florida, area. In order to accomplish the fine-grading, plaintiff had to bring in a scarifier and grader. After the oolite had been scarified and graded, it became necessary for plaintiff to put sand on top to achieve a fine grade exactly 6 inches below the finished floor level.

In view of the nature of the oolite, it could not be placed in the fill in 6-inch layers and compacted by puddling, tamping, or rolling as provided in Paragraph 3–04 of the specifications of the Hooper contract, nor could the oolite be compacted with the use of the light rolling equipment described in Paragraph 3–06 of such specifications. Instead, the material was dumped on the fill from the Euclids in which it was hauled; it was leveled by a bulldozer with a blade and was then compacted by crossing and recrossing it with bulldozers.

12. The Hooper contract called for 88,700 cubic yards of regular excavation and 588,500 cubic yards of borrow excava-

tion. The floor slabs which plaintiff laid covered an area of 1,502,590 square feet and were raised to a height of 42 inches above the natural grade; 195,000 cubic yards of fill were required to construct these embankments.

13. During the progress of the work, plaintiff made several verbal complaints to defendant's representatives on the job that the oolite fill was too high in some places and too low in others, whereupon plaintiff was instructed not to accept the fill until the Hooper Construction Company had rough-graded it in accordance with specifications. However, plaintiff did not make any written or verbal complaints to the contracting officer or to any of defendant's representatives regarding the type of material placed in the fill until December 22, 1943, when plaintiff submitted a written claim to the area engineer. In its claim, which was sent to defendant about a week before the contract was completed, plaintiff requested $63,000 additional compensation for the extra cost of fine-grading the fill. The claim was computed as follows:

| | |
|---|---:|
| Limerock grading, 1,500,000 sq. ft.—0.05¢ | $75,000.00 |
| Sand grading, 1,500,000 sq. ft.—0.01½¢ | 22,500.00 |
| Net increase | 52,500.00 |
| Overhead, profit, bonds, insurance, etc., 20% | 10,500.00 |
| Total additional cost | 63,000.00 |

The area of the fill, which was fine-graded by plaintiff, covered 2,590 square feet more than the amount used by plaintiff in computing its claim.

14. The claim was denied by the area engineer's letter of December 24, 1943, and on December 28, 1943, plaintiff submitted the claim to the contracting officer. On January 24, 1944, the contracting officer disallowed the claim by letter, which read in part as follows:

"You allege as the grounds upon which your request for additional compensation is based that at the time of placing your bid for the work covered by the contract, it was impossible for you to determine the character of the fill which would be placed in the building site by another contractor who had not, at that time, commenced filling operations under his contract. You also state that at the time of making your investigation of the site preparatory to the placing of your bid it was assumed by you that the fill by the other contractor would be made of sand which was the class of material found at the site.

"Under the provisions of par. 1A–04 of Section 1A of the specifications and referred to as Special Provisions, prospective bidders were put on notice that rough grading over the building site, including compaction of the building site, was covered by another contract, and that the embankments within the areas to be covered by concrete floor slabs would be constructed by the other contractor in the same manner as the embankments within the flying field graded areas as directed by the contracting officer. Prospective bidders were further put on notice that, under the contract for which bids were being invited, the contractor would be required to complete the grading as was necessary to place the concrete slabs and construct the foundations. It was also further emphasized that no separate payment nor any adjustment of the contract price will be allowed for any grading done under this contract.

"From the foregoing it can be seen that while it was stated that the other contractor would construct the embankments in the same general manner as those within the flying field graded areas no representation was made in the specifications as to the kind of material which would be used by the other contractor in filling in the area on which the buildings to be constructed under your contract were to be located. There was nothing in the specifications which would justify the assumption that the material to be used would be the same as that at the site. It must have been evident to you that in order to make the fill the other contractor would have to bring it from

some other location. The contract with Hooper Construction Company for grading over the building site stated that the material shall be of a suitable type for satisfactory compaction by the compaction method used. Since no statement as to the specific kind of fill material to be used was made in the specifications and your bid was not conditional upon and the contract as entered into did not specify that sand fill would be used by the other contractor, it must be concluded that in placing your bid you contemplated the use of material of the kind actually used by the other contractor in placing the fill."

15. On January 29, 1944, plaintiff appealed from the adverse ruling to the head of the Department. In a decision rendered on September 15, 1944, the War Department Board of Contract Appeals, acting for the head of the Department affirmed the decision of the contracting officer. The Board held that there were no misrepresentations by the Government; that the specifications cast the whole responsibility upon plaintiff in making its bid, and that the loss claimed by plaintiff was due to its miscalculations.

16. Had the fill been made of sand instead of lime rock, plaintiff could have graded it at a cost of from ½ cent to 1½ cents per square foot. Plaintiff did not keep any record of the cost of the fine-grading. Its claim of 5 cents per square foot is based, in part, on a determination of the cost of the work made at the time it was performed and, in part, on a figure included in plaintiff's bid on some additional work that was authorized by a change order. On October 12, 1943, plaintiff submitted a bid, containing a detailed cost breakdown, for constructing ramp paving and curtain wall foundations at the ends of the warehouses. There was included in the bid an item of 5 cents per square foot for shaping and regrading 13,600 square feet of lime rock fill that had been placed by another contractor. Plaintiff's bid was accepted and a change order for the extra work was issued by the defendant on November 13, 1943.

The presence of the lime rock in the fill saved plaintiff some expense in connection with the foundation excavation, because the defendant permitted plaintiff to use a trenching machine for such excavation and this eliminated the use of forms. The evidence does not establish how much saving was effected thereby.

Second Cause of Action

17. The general provisions of the specifications provided in part as follows:

"1–04. (b) It is understood and agreed that the quantities stated in the quotation form are approximate only, and that no claim shall be made against the Government on account of any excess or deficiency, absolute or relative in them. The estimated quantities will be used as a basis for comparison of quotations and for determining the amount of the consideration of the contract. Within the limits of available funds, the Government reserves the right to increase or decrease these quantities by such amounts as will complete the work, and without change in unit prices, and final payment will not be made until the work is so completed."

18. Paragraph 24–01 of the specifications stated that certain materials, including lumber, were to be centrally allocated to the contractor by the Government and that each bidder should include in his bid the cost of the material allocated by the Government plus the freight charges thereon to the nearest railhead. This specification further provided that the bidder should assume that the cost of the allocated lumber, including freight charges, would be equal to the grand total cost of the lumber as stated elsewhere in the specifications and that if the actual costs varied from the specified figure an equitable adjustment in the money due under the contract would be made. The grand total cost of all allocated lumber, as stated in Paragraph 1A–11 of the special provisions of the specifications, as amended, was $251,700.

The standard building specifications in paragraph 24–01 provide, in part:

"*Centrally allocated materials and equipment.*—(a) If so specifically stated

in the Special Provisions, the Government will designate the sources of and allocate to the contractor some of the materials and equipment required to construct the buildings, utilities, and appurtenances covered by these specifications. * * *

"(c) The materials and equipment to be thus allocated to the contractor are itemized in the Special Provisions. The quantities listed constitute the entire quantities required, except that where lumber and nails are listed, the quantities do not include all of the lumber and nails required in the work. * *

"(e) Each bidder shall include in his quotation the cost of furnishing all materials and equipment allocated by the Government to the contractor and also the freight charges therefor to the nearest railhead.

"Furthermore, the successful bidder will be required to pay for all such materials and equipment, including freight charges to the nearest railhead. In preparing his quotations, the bidder shall assume the cost of such allocated materials and equipment, including freight charges, to be equal to the Grand Total sum of money given in the Special Provisions. If the actual purchase and freight costs differ from this Grand Total, an equitable adjustment in the money due under the contract will be made, based upon receipted invoices."

Section 1A—Special Provisions (Revised) in Sections 1A–01 and 11, provides:

Special Attention is Called to the Following Modifications of the Standard Specification Sections:

"Some of the equipment called for under the various Sections will be furnished by the Government, as specified under these Special Provisions. The furnishing of all such equipment is, in accordance therewith, excluded from this contract, but the contractor shall receive this equipment free from the Government, f. o. b. cars destination railhead, and shall assemble and install it. * * *

"1A–11. Section XXIV—*Centrally allocated and procured materials and equipment.*

"(a) Centrally Procured equipment. —Centrally procured equipment will be furnished by the Government, but shall be received, assembled, and installed by the contractor. Prospective Contractor shall submit quotations Excluding from the Quotation Items the cost of all such equipment. The following equipment will be centrally procured. * *

"(2) All equipment called for in Section XXIV, paragraph 24–02. * * *

"(b) Centrally Allocated equipment. —The following materials will be centrally allocated by the Government, that is, procured by the contractor from Government designated sources.

"Lumber, in accordance with the attached Lumber List.

"The Delivery Schedule shown on the attached Lumber List is tentative only, and is subject to modifications.

"Grand Total Cost of all allocated lumber—$251,700.00."

The bid form contained the following:

"Note that the specifications called for some of the materials and equipment to be furnished by the Government, and that the cost of furnishing such materials and equipment, unless otherwise specified, shall be excluded from quotations."

19. Plaintiff's accepted bid, which was incorporated as Schedule 1 of the contract, provided a separate, fixed amount as the consideration to be paid plaintiff for the construction of each of the nine buildings. Plaintiff's lump sum bid for each of the nine buildings included profit and a distribution of a proportionate share of the cost of insurance, supervision, and other overhead. Item 4 of Schedule 1 of the contract provided that the contract price to be paid for the construction of the Repair Building was $49,600.

On account of plaintiff's misinterpretation of the specifications, its bid and Schedule 1 of the contract did not include the cost of the lumber to be allocated by the Government.

20. On March 29, 1943, plaintiff was notified that Item 4 of Schedule 1 of the contract, the Repair Building, was to be deleted from the contract and that a change order would be issued crediting the Government with $49,600, the contract price for that building. Plaintiff was having difficulty in securing lumber and, shortly after the notice was received, Mr. Chalker informed the area engineer that plaintiff would consent to the deduction of the full amount of plaintiff's bid for the Repair Building, including the loss of profit and overhead allocated to that building, provided the defendant would not reduce the total quantity of allocated lumber. The area engineer agreed that there would be no change in the amount of allocated lumber, and under date of April 12, 1943, the contracting officer issued a change order, which deleted the Repair Building and reduced the contract price by $49,600. The change order, which was thereafter signed and accepted by plaintiff, provided in part as follows:

"It is understood and agreed that on account of the foregoing modification of said contract, additional time will not be allowed.

"It is further understood and agreed that all other terms and conditions of said contract shall be and remain the same."

The evidence does not show when plaintiff signed the change order, but on April 17, 1943, plaintiff wrote the area engineer regarding the deletion as follows:

"Herewith attached please find the following Memorandum of Construction Change dated March 29, 1943, on the above contract.

"This change deletes from the contract Item No. 4—Repair Building, in the amount of Forty Nine Thousand Six Hundred Dollars ($49,600.00). We are authorizing you to deduct the net amount from the contract with the thought in mind, that should the Repair Building, at a later date, be built, that same will be given back to us at the same price providing same is agreeable to us."

There is no evidence that the area engineer had the authority to make the agreement referred to above, or that the contracting officer had any knowledge that such an agreement had been made until February 11, 1944, when plaintiff submitted a claim as hereinafter set forth.

21. If the repair building had been constructed, plaintiff would have incurred additional costs for insurance and for taxes, but plaintiff could have constructed the building without any increase in its supervisory overhead.

22. On April 3, 1943, and again on April 5, 1943, plaintiff's president, Mr. G. A. Chalker, conferred with the contracting officer who was stationed at Jacksonville, Florida. In the conferences, Mr. Chalker informed the contracting officer that plaintiff had made a mistake in its estimates and in its bid by omitting the cost of the allocated lumber, which amounted to $251,700, and requested that the contract price be increased in that amount. The contracting officer asked plaintiff to submit its original estimate sheets for examination and, after studying them, the contracting officer determined that plaintiff had made the mistake as claimed. Thereupon the contract was amended by inserting Sheet 2-A on which the cost of the allocated lumber was added to the contract price. During the conferences, no mention was made of the verbal agreement which had been entered into between plaintiff and the area engineer as stated in finding 20.

23. The price of $49,600 was the net price of the Repair Building and did not include a proportion of the cost of the allocated lumber which had been added to the contract price at plaintiff's request after plaintiff was notified that the Repair Building would not be constructed. The $49,600, however, did include the cost of some lumber which plaintiff was required to furnish without benefit of Government allocation. Of the total quantity of lumber to be allocated by the defendant, 182,508 board feet would have been used in the Repair Building, and at the price at which such allocated lumber was obtained by the defendant, the 182,508 board feet of lumber was valued at $9,786.73.

24. On January 7, 1944, after completion of the contract, the contracting officer issued Modification No. 35, which was a final settlement and accounting of the lumber which the Government had allocated to plaintiff for performance of the contract. Included in the change order was a provision which reduced the contract price in the sum of $9,786.73 for the proportional cost of the allocated lumber that would have been used in the Repair Building. In order to obtain payment of the final amount due under the contract, plaintiff executed Modification No. 35 but returned it to defendant with a letter of February 11, 1944, which read as follows:

"We hereby submit our claim for $9,786.73 covering the deduction made on the allocated amount of lumber, due to the elimination of Item 4 of the contract schedule.

"Change Order No. 1, dated April 12, 1943, omitted Item No. 4 of the contract schedule, covering Repair Building, and at the time this Change Order was signed, the amount of allocation of lumber was discussed with Major Reade, then Area Engineer, who informed the writer, that if we gave full credit for the contract amount for the elimination of this building, that there would be no change in the allocated amount of lumber.

"We feel that we have been unjustly treated in having the allocation changed, some ten months later at the completion of the work, and we respectfully request that you rewrite Modification No. 35 (which we are signing today under protest) not making any deduction from the allocated amount of lumber."

25. Plaintiff's claim of February 11, 1944, was denied by the contracting officer in a letter dated March 2, 1944, on the ground that the allowance of the claim would constitute a payment of Government funds without any consideration to the Government. The letter of denial did not refer to plaintiff's agreement with the area engineer.

On April 4, 1944, the successor to the contracting officer made findings of fact which read in pertinent part as follows:

"5. From the foregoing it will be observed that the total quantity of lumber furnished by the contractor from allocation sources, plus that furnished by the Government and the 38,901 feet which the contractor was authorized to purchase from open market and applied as allocated lumber was 4,511,325 feet or 182,500 feet less than the contract originally contemplated would be procured from allocated sources. This 182,500 feet was, as indicated above, deleted from the contract by reason of the elimination of the construction of the repair building under Item No. 4 of the contract. This lumber was not furnished by the contractor, neither does he allege that it was purchased by him and is available to the Government.

"6. In his letter of 11 February 1944 (*Exhibit 3*) the contractor states that at the time of entering into Change Order No. 1 the Area Engineer informed the contractor that if full credit for the contract price for Item No. 4 was given in the elimination of this item from the contract there would be no change in the allocated quantity of lumber. No evidence has been produced in support of such statement. Granting that such an agreement had been made and that no reduction in the quantity of allocated lumber had been provided for as the result of the elimination of Item No. 4 from the contract, the contractor could not have been paid for lumber which he did not furnish. If the contractor had been required to furnish the 182,508 feet of lumber in question, he would have been reimbursed therefor on the basis of the actual cost of the lumber plus the cost of transportation to the railhead nearest the contract site, and the lumber held in a Government stockpile for use on other work.

"7. While Modification No. 35 was not itself actually signed under protest

the contractor did serve notice of such intention in his letter of 11 February 1944 (*Exhibit No. 3*). He also signed under protest a voucher covering a subsequent payment under the contract."

26. Plaintiff appealed from the ruling of the contracting officer to the head of the department and, in a decision dated September 19, 1944, the War Department Board of Contract Appeals denied plaintiff's claim. The Board's decision read in part as follows:

"The reservation by the Government, then, of the right to increase or decrease the number of buildings to be erected, *so long as the unit prices were not disturbed,* was clearly made. Consequently, the adjustment in the contract price by reducing it in the amount of the unit price bid and accepted, was exactly in conformity with the contract, and was not an inequity upon appellant, even though appellant did, as a matter of fact, lose a portion of its overhead and profit included in its price bid. This was a contingency which appellant agreed to when it executed the contract.

"It follows that appellant had nothing to offer to the Government, in the way of consideration, for any agreement between the area engineer and appellant to abandon the Government's right to have the contract price reduced by the amount of allocated lumber not purchased for the work. The area engineer, then, was without authority to make any such agreement. We are bound to agree with the contracting officer's ruling * * * that allowance of any part of the claim would constitute payment from Government funds without any consideration whatever to the Government.

"It must be kept clearly in mind that this is not a situation where the same item has been deducted twice. The unit price bid on Item 4 did not include any amount for lumber * * *. Therefore, when the unit price for Item 4 was deducted from the contract price, there was still to be deducted from the contract price any amount of lumber allocated but not used, in order

to conform to Paragraph 24–01(e) * * * of the specifications. That was the contracting officer's plain duty under the contract."

### Conclusion of Law

Upon the foregoing special findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover, and its petition is therefore dismissed.

Judgment is rendered against plaintiff for the cost of printing the record herein, the amount to be entered by the clerk and collected by him according to law.

Herman J. Galloway, Washington, D. C. (Paul M. Rhodes, and King & King, Washington, D. C., on the brief), for the plaintiff.

Gilbert E. Andrews, Washington, D. C., Holmes Baldridge, Asst. Atty. Gen., for the defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

LITTLETON, Judge.

The plaintiff entered into a contract with the defendant dated March 26, 1943, for the construction of a number of warehouses and a repair building at the Army Air Forces Depot at 36th Street Airport, Miami, Florida. The original specifications in the Government's invitation to bid required the contractor to "perform all work of clearing, excavating, filling, backfilling, and grading," required in connection with the construction.

In February 1943, prior to submission of plaintiff's bid, the Government entered into a contract with the Hooper Construction Company, for the necessary filling and rough grading, and accordingly the original specifications in the invitation to plaintiff to bid were amended on March 17, 1943, to eliminate the work of filling and rough grading. Defendant notified plaintiff of the amendment by telegram on March 20, 1943, stating in part: "All earth fill will be placed by others. Building contractor will fine grade fill only."

The amended specifications included the following:

"1A–04. *Excavation, filling and grading.*—(a) Rough grading over the building site is covered under another contract, including compaction of the fill, specified as follows:

"Buildings having elevated concrete floor slabs on fill, shall have the fill carefully placed to the proper elevation.

" \* \* \* The embankments shall be placed in layers not exceeding six inches, each layer to be compacted by puddling, tamping, or rolling to 100 percent of the maximum density at optimum moisture.

"(b) Under this contract, the contractor shall complete the grading, as necessary to place the concrete slabs and to construct the foundations, and shall base his quotations upon estimates of the work required to accomplish this, which estimates shall be based upon the contractor's visual inspection of the grading work actually accomplished. No separate payment nor any adjustment of the contract price will be allowed for any grading done under this contract.

"1A–05. *Section III—Concrete work.*—(a) All concrete slabs on earth fill shall be 6 in. thickness."

Plaintiff submitted its bid on the contract under the amended specifications on March 24, 1943, and the contract was awarded to plaintiff March 26, 1943. As far as filling and grading were concerned, plaintiff had only to fine grade the fill placed and rough graded by the Hooper Company.

It is from the nature of the material used by Hooper in the fill that the controversy here arises, under plaintiff's first cause of action. The fill placed by Hooper consisted principally of a material technically known as "oolite" containing a high percentage of lime. The material was excavated from under water and was soft when dumped on the fill. When it became dry, however, after about a week, it became quite hard. Plaintiff had planned to perform the fine grading by hand labor, using shovels at first and then leveling the fill at the specified elevation with straight edges after the screeds for the concrete slab floors were set

in place. This is a method commonly used in fine grading a sand fill.

Because of the hardness of the fill material, however, plaintiff was unable to fine grade it with hand labor as planned, and had to bring in a scarifier and power grader to accomplish the work. After the oolite had been scarified and graded, it became necessary for plaintiff to put sand on top to achieve a fine grade exactly 6 inches below the finished floor level, as required by the specifications. As a result of the extra work occasioned by the use of oolite in the fill by the Hooper Company, plaintiff's costs were considerably above those originally anticipated by plaintiff on this particular item when it submitted its bid to defendant. It is for this difference in costs that plaintiff sues in its first cause of action.

Plaintiff contends in effect that its contract did not contemplate the use of oolite in the fill, and that plaintiff could not reasonably have been expected to anticipate the use of oolite as a fill material. Plaintiff asserts rather that its obligation under the contract was to fine grade a sand fill and that the use of oolite instead of sand was a breach of the contract by the Government.

In support of its position plaintiff relies upon the telegram of March 20, 1943, and the amended specifications which referred to an "earth fill." Plaintiff contends that the term "earth fill" did not include an oolite fill. Plaintiff also points to that part of the amended specifications which required compaction of the fill by puddling, tamping, or rolling. Plaintiff argues that this method of compaction was inappropriate to compaction of oolite but was entirely appropriate to compaction of a sand fill.

Plaintiff further cites that part of the amended specifications which increased from 4 to 6 inches the thickness of the concrete floor slabs to be placed on the fill. In this regard plaintiff argues that an increase in thickness of the floor slab would not normally have been consistent or necessary with the use of a high content limestone fill such as oolite, but was consistent with the use of a softer fill such as sand.

These arguments are advanced to show that plaintiff reasonably construed the contract to contemplate the fill would consist

of sand and not an oolite. Whatever the force of these arguments in the absence of other factors, however, they are not persuasive of the validity of plaintiff's position in the face of certain other specific provisions in plaintiff's contract.

The invitation to bid contained the following provision:

"XII. Investigation of conditions: Bidders are expected to visit the locality of the work and acquaint themselves with all available information concerning the nature of materials to be excavated from structure excavations and the local conditions bearing on transportion [sic], handling and storage of materials. They are also expected to make their own estimates of the facilities needed, difficulties in attending the execution of the proposed contract, including local conditions, availability of labor, water, electric power, roads, uncertainties of weather, and other contingencies. In no event will the Government assume any responsibility whatever for any interpretation, deduction, or conclusions drawn from examination of the site. At the bidder's request, a representative of the Government will point out the site of the proposed operations. Failure to acquaint himself with all available information concerning these conditions will not relieve the successful bidder from responsibility for properly estimating the difficulties and costs of successfully performing the work."

Paragraph 1A–04 of the amended specifications, supra, was equally explicit in charging plaintiff with knowledge of the grading work at the site.

Plaintiff did not send a representative, its superintendent, to inspect the site until receipt of the amended specifications. No borrow pit was actually opened when the superintendent visited the project area. The first pit was opened by the Hooper Company on March 23, 1943, the day after the superintendent's visit, and the day before plaintiff's bid was submitted. Oolite was taken from this pit to build a haul road for Hooper, but none was placed on the fill itself until March 27, 1943.

The evidence discloses that the soil in and adjacent to the airport site consisted principally of oolite, with an overburden of sand and muck which varied in depth from 6 to 18 inches. The sand overlying the lime rock was a fine sand, known locally as "ball-bearing sand," because its particles would not adhere. Such sand could be used for a fill in the construction of small buildings but was not suitable as a fill for large buildings unless confined by foundation walls.

The extent of the superintendent's investigation is not altogether clear, and it does not appear that in fact he saw any lime rock. He reported merely that the construction area was level and sandy and covered with grass, and that no fill had yet been placed. Nevertheless the evidence is that the oolite or lime rock was definitely visible to an observer in the spoil banks around the drainage canals adjacent to the airport site.

In addition, plaintiff's president, Mr. Chalker, had previously performed another contract in the same area, and was himself familiar with the site and the nature of the soil.

Further, the amended specifications expressly advised plaintiff that the fill was to be placed by another contractor. The contract and specifications of the other contractor, the Hooper Construction Company, were on file in the District Engineer's office in Jacksonville, Florida, where plaintiff's president had prepared plaintiff's bid. Although the drawings attached to the Hooper contract did not themselves indicate the nature of the fill material, they did indicate the borrow area from which that material was to be taken, and core borings taken from that area disclosed the presence of oolite. Plaintiff made no inquiry and no effort to see that contract, or to further determine the nature of the fill to be placed by the Hooper Company.

In view of the contractual provisions charging plaintiff with investigation of conditions in the locality, and with knowledge of the grading work, and of the fact that oolite was actually observable in the spoil banks around the drainage canals adjacent to the airport site, and of the

further fact that plaintiff's president had actual knowledge of the nature and condition of the soil in the vicinity, the principal component of which was oolite, we do not believe that plaintiff was free under the contract to assume that oolite would not be used in the fill, or that sand would be used to the exclusion of oolite.

Plaintiff's assumption that the fill would be sand which had only a very limited use as a fill material for large buildings, was made at plaintiff's peril, and the resultant loss cannot, under the facts and the terms of the contract, be shifted to the Government. Plaintiff's first cause of action must be dismissed.

Recovery by plaintiff on its second cause of action depends upon the scope and effect of an agreement made between plaintiff and the defendant's area engineer concerning certain lumber allocations by the Government under the contract.

The contract specifications originally called for the construction of eight warehouses and a repair building. Under the contract plaintiff was required to purchase a portion of the lumber requirements on the open market. The major portion, however, plaintiff was to purchase under Government allocations, as follows: the Government was to make awards to the various vendors of lumber in the name of and to the account of the plaintiff, who was in turn to purchase such lumber for use on the contract, and make payment to the vendors.

Plaintiff was instructed by the specifications to include in the computation of its bid under the contract the amount of $251,700 as the cost of the allocated lumber. This figure was subject to equitable adjustment upon the completion of the contract if the actual costs of the allocated lumber differed therefrom.

Through a misinterpretation of the specifications, however, which is not here in dispute, plaintiff failed to include this amount when it submitted its bid on the contract. As will be seen, this error was later corrected.

On March 29, 1943, plaintiff was notified that the repair building was to be eliminated from the contract, and that a change order would be issued crediting the Government with $49,600, which was the price bid by plaintiff on that item, including a proportionate share of overhead and profit. Plaintiff was having difficulty in securing lumber on the open market, and shortly after the notice was received plaintiff informed the Government's area engineer that it would consent to the deduction of the full amount of its bid on the repair building, including loss of overhead and profit allocated to that item, provided the defendant would not reduce the total quantity of allocated lumber. To this the area engineer agreed. This agreement, which is the one in question, was not in writing, however, and it does not appear that the defendant's contracting officer had any knowledge thereof until almost a year later, in February 1944. Under date of April 12, 1943, the contracting officer, acting pursuant to the notice of March 29, 1943, issued a change order which deleted the repair building from the contract, and reduced the contract price by $49,600.

The evidence does not disclose when the plaintiff signed the change order, but on April 17, 1943, it wrote the area engineer regarding the deletion, enclosing a Memorandum of Construction Change, and stating:

"We are authorizing you to deduct the net amount from the contract with the thought in mind, that should the Repair Building, at a later date, be built, that same will be given back to us at the same price providing same is agreeable to us."

On April 3, and again on April 5, 1943, in conferences with the Government's contracting officer in Jacksonville, Florida, plaintiff's president informed the contracting officer that plaintiff had mistakenly omitted the $251,700 item for allocated lumber in computing its bid on the contract, and requested an increase in the contract price by that amount. Upon investigation by the contracting officer the contract was amended to increase the contract price as requested. No mention was made during these conferences of the verbal agreement between plaintiff and the area engineer in Miami. The $251,700 figure, of course, represented the cost of the allocated lumber

for the entire project as originally contemplated, including the amount of $9,786.73 as the proportionate cost of allocated lumber which would have been used in construction of the repair building.

On January 7, 1944, after completion of the contract, the contracting officer issued a further modification of the contract in final settlement and accounting for the allocated lumber. Included in that modification was a provision which reduced the contract price by $9,786.73, which is the sum here sought by plaintiff in its second cause of action. Defendant contends that plaintiff is not entitled to that amount, that is, the proportionate cost of lumber allocated to the repair building, because the repair building had been deleted from the contract, relieving plaintiff from the necessity of incurring that cost.

Plaintiff contends, however, that it is entitled to the full cost of the allocated lumber, without reduction, notwithstanding the deletion of the repair building, by virtue of the verbal agreement with the area engineer that the lumber allocations would not be reduced.

To this argument defendant replies first that even though there may have been an agreement not to reduce the amount of lumber allocated to plaintiff, there was no agreement by the area engineer that defendant would relinquish its right to reduce the contract price by the cost of the lumber not used in the deleted repair building.

Defendant says further, and this is its chief defense, that regardless of the terms of the understanding between plaintiff and the area engineer, the latter had no authority to make such an agreement, and that in no event can it be held binding upon the Government.

▮ This position is well taken. Although the area engineer may have been the authorized representative of the contracting officer for certain limited purposes under the contract, there is no indication either in the contract or elsewhere of any authority in the area engineer, without approval of the contracting officer, to so amend the contract itself by an agreement of this sort.

▮ Not only was the agreement not reduced to writing, the man who did have such authority, the Government's contracting officer, did not know of it until long after it was made. Plaintiff's president did not mention it in his conferences with the contracting officer, at a time when it was certainly material to the subject under discussion. Plaintiff was bound to take notice of the limits of the area engineer's authority, and the Government is not bound by his unauthorized acts. Kelly v. United States, 91 F.Supp. 305, 116 Ct.Cl. 811, 817–820.

Defendant has also contended that this agreement is not binding upon the Government for lack of consideration. Our holding that the area engineer had no authority to make the agreement in the first place, makes it unnecessary to consider this defense.

The plaintiff is not entitled to recover, and its petition is dismissed. It is so ordered.

JONES, C. J., and HOWELL, MADDEN and WHITAKER, JJ., concur.