**RUST COMMUNICATIONS GROUP, INC., et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 604–87 T.

United States Claims Court.

May 14, 1990.

Lyman G. Friedman, Washington, D.C., for plaintiffs.

Elizabeth D. DePriest, Washington, D.C., with whom was Shirley D. Peterson, Asst. Atty. Gen., for defendant.

## OPINION

RADER, Judge.

In this tax refund action, plaintiffs—a closely held corporation and shareholders—challenge the tax consequences of the sale of the corporation's radio stations. Plaintiff corporation, Rust Communications Group (Communications), transferred the stations to shareholders in the form of a partial liquidation. The shareholders then sold the stations to purchasers.

The Internal Revenue Service (IRS) considered plaintiffs' transaction a sale of assets by the corporation. Therefore the IRS taxed the corporation on gains. According to plaintiffs, however, the shareholders effected the sale and the IRS improperly taxed the corporation.

Also at issue is a $59,145.87 refund claim under the theft loss provision of the Internal Revenue Code (the Code). 26 U.S.C. § 165 (1982). An employee embezzled substantial sums from plaintiffs. This same employee did not file plaintiffs' taxes on time. Plaintiffs claimed the assessment for late filing as a theft loss deduction. The IRS disallowed the deduction because the assessment is a penalty.

Plaintiffs move for summary judgment on the issue of corporate taxes. Defendant moves for summary judgment on the theft loss issue. After oral argument, this court denies plaintiffs' motion and grants defendant's motion. This court has already scheduled trial—June 26–27, 1990—on the corporate tax issue.

## FACTS

### Sale of Radio Stations

Communications was a closely held corporation organized under New Hampshire law in 1962. Communications owned and operated radio stations. William Rust, a pioneer in the radio broadcasting industry, was founder and president of the corporation. Other members of his family served as directors. The Rust family directly or indirectly owned all of the outstanding stock.

Mr. Rust was the driving force behind the corporate affairs and success of Communications. Due to Mr. Rust's reputation as a broadcasting pioneer, other companies approached him directly to transact business. He was majority shareholder of Communications, holding 51.7% of the outstanding stock. Each of the family-member shareholders authorized Mr. Rust to represent his or her interest during the negotiations for sale of several radio stations. According to Roberta Rust Jeffries, Mr. Rust was "perpetually [the stockholders'] agent from 1976 onwards." Plaintiffs' Brief in Support of Their Motion for Summary Judgment, filed Feb. 16, 1990 (Pl.Br.), Appendix, at 56.

In all of the sales, the directors authorized Mr. Rust to represent Communications as well as the shareholders. Thus, Mr. Rust's intent was in a sense the corporate will of Communications.

Before 1981, Communications sold 12 radio stations. In 1975, after selling 10 stations, Mr. Rust learned that the corporation could avoid substantial taxation by structuring the sale as a partial liquidation to shareholders. The shareholders in turn would sell to the ultimate purchaser. In 1975 and 1977, Communications disposed of two radio stations in this manner.

In 1981, Communications decided to sell five more radio stations. Communications sold one station each in the years 1981, 1982, and 1983. In 1985, Communications sold the last two stations and dissolved.[1]

In each of the four sales at issue, brokers, owners, or general managers telephoned Mr. Rust on behalf of other radio broadcasting companies to express an interest in purchasing a radio station from Communications. Mr. Rust initially rejected these offers or did not respond. He was

---

1. The last sale is not part of this dispute.

"aware that the tax impact resulting from the sale of radio station assets by the corporation would be very great, and that the most favorable tax treatment would be achieved by a liquidation ... to the shareholders and a sale by them ... to the purchaser." Stipulation, filed Dec. 20, 1989 (Stipulation), at ¶ 15. The interested buyers then delivered letters to Mr. Rust offering to buy the stations from Communications. At negotiations, the buyers changed the letters to reflect an offer to the shareholders rather than to Communications.[2]

The shareholders subsequently granted Mr. Rust powers of attorney in each of the transactions and also authorized Mr. Rust as president to negotiate sale of the radio stations. The shareholders played no other functional role in the transaction, except to transfer the radio stations pursuant to the agreements Mr. Rust executed.

Mr. Rust and the buyers ultimately executed asset purchase agreements contingent on the IRS and Federal Communications Commission (FCC) approvals. These agreements gave Communications the power of performance and characterized the transaction as an obligation of the company. The FCC application similarly characterized shareholder participation as a mere formality.

The shareholders reported to the IRS each of the five sales from 1981 through 1985. The IRS asserted that the first four sales were made by Communications and therefore subject to a corporate tax for sale as well as for distribution to the shareholders. Plaintiffs challenge the IRS's determination that the corporation effectuated the sales. Plaintiffs now move for summary judgment on this issue.

### Theft Loss Deduction

In 1981, Communications paid a $59,-145.87 assessment levied under 26 U.S.C. § 6651(a)(2) (1982) for failure to pay 1980 corporate income taxes on time. On its 1981 returns, Communications claimed a theft loss deduction of nearly $2 million. A disgruntled employee had embezzled this amount from corporate funds over a six-year period. The embezzling employee caused Communications to file late. Communications included the assessment for untimely filing as part of the theft loss.

The IRS disallowed Communication's inclusion of the untimely filing penalty in its theft loss claim. Communications thereafter filed a claim for refund, which the IRS denied. Communications now seeks a refund for the assessment in the United States Claims Court. Defendant has moved for summary judgment on the issue.

### DISCUSSION

#### Summary Judgment

When no material facts are in dispute, RUSCC 56 authorizes this court to resolve issues as a matter of law. *D.L. Auld Co. v. Chroma Graphics Corp.*, 714 F.2d 1144 (Fed.Cir.1983). The Supreme Court has underscored the importance of summary judgment:

> Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) (citation omitted).

The movant for summary judgment must prove both absence of factual disputes and entitlement to judgment as a matter of law. *Adickes v. Kress*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). Summary judgment procedures do not enable the trial court to evaluate independently the evidence. Rather, at the summary judgment stage of the proceeding, the judge must "determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

---

**2.** In two of the transactions, however, Rust did not mention formal involvement of the shareholders until well into negotiations.

In this instance, this court detects a genuine issue for trial. The parties have stipulated many facts pertinent to the legal issues. *See* Stipulation, No. 604–87 C, filed Dec. 20, 1989. The record contains other facts in the form of reasonably detailed documents and deposition testimony. Plaintiffs have amassed strong and persuasive evidence to support their legal argument. Defendant, however, also produced facts to support its legal contentions. Plaintiffs therefore have not shown entitlement to judgment as a matter of law. The legal questions raised by this case require this court to weigh carefully the entire factual presentation.

Both parties rely on affidavits, documents, and deposition testimony to support their legal arguments. Written statements often do not provide the entire context and significance of the events they report. Thus, where the outcome of a case may depend on the emphasis or predominance of some facts over others, the court should seek more factual clarification than affidavits and documents usually supply.

In order to understand fully and give proper legal weight to competing factual presentations, this court will hold a trial. The United States Court of Appeals for the Fifth Circuit explained:

> [B]efore rendering judgment the court must be satisfied not only that there is no issue as to any material fact, but also that the moving party is entitled to a judgment as a matter of law. Where ... the decision of a question of law by the Court depends upon an inquiry into the surrounding facts and circumstances, the court should refuse to grant a motion for summary judgment until the facts and circumstances have been sufficiently developed to enable the court to be reasonably certain that it is making a correct determination of the question of law.

*Shahid v. Gulf Power Co.*, 291 F.2d 422, 423–24 (5th Cir.1961), *cert. denied*, 370 U.S. 923, 82 S.Ct. 1563, 8 L.Ed.2d 503 (1962), quoting *Palmer v. Chamberlin*, 191 F.2d 532, 540 (5th Cir.1951).

Thus, where the evidence suggests that the court must weigh the legal significance of competing factual presentations, summary judgment is not appropriate. The United States Court of Appeals for the Eighth Circuit explained:

> [T]he court's conclusion necessarily involved a choice or evaluation between two rational possibilities. Evaluative judgment between two rationally possible conclusions from facts cannot be engaged in on summary judgment. Only where the facts supportive of a summary judgment can be held to have so unambiguously established the actualities of a situation as to leave no basis of substance for dispute as to their reality or as to the conclusion required from them is a summary judgment entitled to be entered.

*Chenette v. Trustees of Iowa College*, 431 F.2d 49, 52 (8th Cir.1970).

This court denies plaintiffs' motion for summary judgment. The parties emphasize different facts and have reached divergent conclusions. This court will resolve the legal question after a fuller ventilation of the facts at trial. *See Ruddick Corp. v. United States*, 226 Ct.Cl. 426, 438–39, 643 F.2d 747, 754–55 (1981) (Davis, *J.*); *Crucible, Inc. v. United States*, 219 Ct.Cl. 124, 130, 591 F.2d 643, 646 (1979) (Per Curiam).

### Sale of Corporate Assets by Shareholders

Plaintiff contends that the Government should tax the shareholders, not Communications, for income derived from the sale of the radio stations. Defendant contends, however, that the Government properly taxed Communications for the sale of the stations. The parties rely on the same two landmark Supreme Court cases to support their conflicting positions. *United States v. Cumberland Pub. Serv. Co.*, 338 U.S. 451, 70 S.Ct. 280, 94 L.Ed. 251 (1950); *Commissioner v. Court Holding Co.*, 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981 (1945).

In *Court Holding,* a corporate taxpayer endeavored to sell its sole asset, an apartment building. The corporation initiated negotiations for sale while it had legal title to the building. It reached an oral agreement with the purchaser for sale and

scheduled written execution. The corporation's attorney then advised the purchaser that the corporation could not consummate the sale as envisioned because of the large tax consequences. The next day, the corporation liquidated the assets to its shareholders. The shareholders therefore received the deed for the apartment building. The shareholders then sold the building to the originally contemplated purchaser three days later.

The Supreme Court upheld the United States Tax Court's decision that the *Court Holding* transaction did not relieve the corporation from tax liability. For a unanimous court, Justice Black wrote:

> The incidence of taxation depends upon the substance of a transaction. The tax consequences which arise from gains from a sale of property are not finally to be determined solely by the means employed to transfer legal title. Rather, the transaction must be viewed as a whole, and each step, from the commencement of negotiations to the consummation of the sale, is relevant.

*Court Holding*, 324 U.S. at 334, 65 S.Ct. at 708. Reviewing the Tax Court's conclusion under this standard, the Supreme Court agreed that the liquidating dividend and transfer of legal title were "mere formalities." These formalities did not change the extensive character of the corporation's involvement throughout every stage of negotiations. *Court Holding*, 324 U.S. at 333, 65 S.Ct. at 708. The Supreme Court emphasized that "each step" of the entire transaction is relevant to the resolution of the legal question about the corporation's tax status. The IRS therefore properly taxed the corporation.

The Supreme Court reached the opposite result under a different set of facts five years later in *Cumberland*. Shareholders of the Cumberland Public Service Company offered to sell their shares to a cooperative. The cooperative refused to buy the stock but counteroffered to buy some of Cumberland's equipment. Cumberland itself refused to make the sale because of the tax consequences. The shareholders nevertheless offered to buy the equipment from Cumberland and then sell it to the cooperative. The parties executed the sale in this manner.

Like the corporation in *Court Holding*, Cumberland transferred its property as a liquidating dividend to shareholders. The shareholders then sold the property to someone else. The liquidation, however, "genuinely ended the corporation's activities" and "at no time did the corporation plan to make the sale itself." *Cumberland*, 338 U.S. at 453, 70 S.Ct. at 281. The Supreme Court therefore affirmed the Court of Claims's conclusion that "sales of physical property by shareholders following a genuine liquidation distribution cannot be attributed to the corporation for tax purposes." *Cumberland*, 338 U.S. at 455, 70 S.Ct. at 282. The Supreme Court again emphasized the fact-sensitive nature of this legal inquiry:

> It is for the trial court, upon consideration of an entire transaction, to determine the factual category in which a particular transaction belongs. Here as in the *Court Holding Co.* case we accept the ultimate findings of fact of the trial tribunal.

*Cumberland*, 338 U.S. at 456, 70 S.Ct. at 282–83.

■ *Cumberland* and *Court Holding* identified the lines of inquiry for deciding whether a corporation instead of its shareholders actually sold assets. The Supreme Court expects the trial court to probe into the corporation's motives and intent. The Court of Claims decision affirmed by the Supreme Court in *Cumberland* relieved the corporation from tax liability principally because of intent:

> There was never at any time an intention on the part of the plaintiff company or of its stockholders to cause this company to make the sale of its physical properties, because it was thought from the beginning that this would result in the greatest tax liability.

> . . . .

> There was never any intention that the corporation should make the sale. . . .

*Cumberland Pub. Serv. Co. v. United States,* 113 Ct.Cl. 460, 480, 482, 83 F.Supp. 843, 853, 855 (1949).

A corporation may express intent subjectively through its officers' statements or objectively through its corporate conduct.[3] The Supreme Court encouraged trial courts to review objective as well as subjective manifestations of intent. Courts should review the "substance of a transaction," not "mere formalities." *Court Holding Co.,* 324 U.S. at 333–34, 65 S.Ct. at 708. The Supreme Court explained "that in resolving such questions as who made a sale, fact-finding tribunals in tax cases can consider motives, intent, and conduct in addition to what appears in written instruments...." *Cumberland,* 338 U.S. at 454 n. 3, 70 S.Ct. at 282 n. 3.

Thus, the Supreme Court expects the trial court to consider the actual conduct of the parties at all stages of negotiation. Justice Black specifically noted that "[i]t is for the trial court, *upon consideration of the entire transaction,* to determine the factual category in which a particular transaction belongs." *Cumberland,* 338 U.S. at 456, 70 S.Ct. at 282–83 (emphasis added). The degree of direct corporate negotiation is an important component of a taxpayer's conduct. *Cumberland,* 338 U.S. at 452–53, 70 S.Ct. at 280–81; *Court Holding,* 324 U.S. at 333, 65 S.Ct. at 708. The timing of conduct is also important. The trial court must consider the point at which the corporation chose to sell assets through shareholders. *Id.*

Thus, plaintiffs' intent is not the only factor in this court's decision. Rather, this court must weigh the motives, intent, and conduct associated with the transaction as a whole.

▋ In sum, then, a corporation can avoid tax liability by structuring a sale of assets through shareholders. The motives, intent, and conduct of the corporation must show that the transaction was a genuine shareholder sale. If the corporation plays an active role in negotiations and manifests an intent to effect the sale on its own, then the IRS may levy a tax on the sale of assets by the shareholders.

*Court Holding* and *Cumberland* agree that the trial court must weigh carefully the entire body of facts to determine the nature of the corporate and shareholder activity. Unless the facts clearly and unequivocally show a corporate sale or a shareholder sale, this court cannot fulfill that obligation in an abbreviated summary judgment setting.

### *Tax Consequences of the Radio Station Sales*

▋ In the case at bar, the parties genuinely disagree about the weight and import of the facts. This court expects a trial to cast more light on the relative significance of the facts.

Plaintiff relies on the subjective intent of Mr. Rust in attributing the asset sale to the shareholders. Paragraphs 15 and 18 of the joint stipulation of facts are the core of plaintiff's claim:

15. In 1975 Rust became aware that the tax impact resulting from the sale of radio station assets by the corporation would be very great, and that the most favorable tax treatment would be achieved by a liquidation of the radio station assets to the Shareholders and a sale by them of those assets to the purchaser.

. . . .

18. Rust's purpose, in attempting to structure the form of the sales in issue as partial liquidations of radio stations' assets to the Shareholders followed by sales thereof to third party purchasers, was to minimize the federal income tax impact of the sales on Communications and its Shareholders.

Stipulation, at ¶¶ 15 and 18.

Plaintiffs thus present very persuasive evidence of the corporation's motives and

---

**3.** The line between conduct and intent is difficult to draw. Plaintiff has suggested that intent is the sole inquiry and that conduct is the only reliable objective manifestation of intent. Defendant, however, speaks of intent, conduct, and the writings as separate considerations. So long as the court considers the writings, conduct, and intentions of the parties in some meaningful fashion, there is no need to dwell on how to categorize these different forms of evidence.

intent. Mr. Rust was the principal officer and majority shareholder of Communications. Mr. Rust also appears to be the dominant patriarch of a closely-held family of shareholders. Mr. Rust's subjective intent, in the absence of substantial rebutting evidence, likely represents both the corporation's and the shareholders' intent. Plaintiff therefore concludes:

> Where, as here, it has been stipulated that the intent of the taxpayer, from the outset, was to structure a sale by the shareholders, the outcome in favor of the taxpayer naturally follows and is inescapable.

Pl.Br., at 28–29. This showing by plaintiffs presents a high hurdle to defendant.

Defendant attempts to distinguish Mr. Rust's subjective intent from the corporation's manifest objective conduct. Defendant contends that Communications played a role at all stages of the radio station sale. According to defendant, the corporation acted as an "indispensable principal" while "the shareholders' role was nominal and, from an economic standpoint, superfluous." Opposition of the United States to Plaintiffs' Motion for Summary Judgment, filed Mar. 29, 1990, at 31.

In support of this contention, defendant notes that "[i]n three of the sales involved, before the sales contracts were signed, Communications' Directors authorized Mr. Rust as its President to negotiate and transact the sales." Stipulation, at ¶ 24. The shareholders each executed a power of attorney to Mr. Rust, never took control of the stations, and only had to transfer the stations if the FCC and the IRS approved the transaction.[4] Communications in fact represented to the FCC that the sale was in the best interest of the corporation and that shareholder participation merely was a formality. Further, Communications had significant authority and obligations under the language of the purchase agreements.

Mr. Rust did not tell purchasers about the shareholders' role until well into the transaction, after the parties agreed to price and other terms.[5]

Plaintiffs respond that Communication's involvement in the transaction does not show that it sold the radio stations. Rather, the corporation had to give assurances that it would maintain the condition of the assets until the actual passage of title. At oral argument, plaintiffs' counsel explained that such assurances are not uncommon where consummation of a sale may take months and the buyer does not have physical control of the assets during that period.

Under *Cumberland* and *Court Holding,* this court must consider the subjective intentions cited by plaintiffs as well as the actual conduct of negotiations and written documents relied on by defendant. This court must review the substance of the transaction as a whole. This court must weigh evidence of intent as well as evidence of corporate conduct.

In sum, the corporation either acted as an indispensable party to negotiations or merely gave assurances that it would act prudently until official transfer of title to the shareholders. The outcome of the case depends on the meaning of the corporate actions and whether these corporate actions predominate over Mr. Rust's intent to structure this deal as a shareholder sale. The facts in the record accompanying this motion do not give this court sufficient basis to reach a final legal conclusion. These questions of fact and law preclude summary judgment.

### *Deductible Loss Claim*

Under § 165 of the Code, a taxpayer may deduct theft losses beyond any insurance recovery. This allowance is "subject to any provision of the internal revenue laws

---

4. As the parties' stipulation properly states, "[n]o transfer of control of a radio station or of its Federal Communications Commission ("FCC") license can be made without first obtaining FCC approval." Stipulation, filed Dec. 20, 1989 (Stipulation), at ¶ 26.

5. To buttress its opposition to plaintiffs' motion, the Government also notes that Communications assigned accounts receivable directly to the buyers, and never distributed them to the shareholders. Furthermore, the brokers ultimately billed the corporation for the sale of the Troy and Albany stations.

which prohibits the deduction." 26 C.F.R. § 1.165–1 (1989).

■ Under § 162(f) of the Code, a taxpayer may not deduct "for any fine or similar penalty paid to a government for the violation of any law." 26 U.S.C. § 162(f) (1982). In an interpretive regulation, the United States Department of Treasury (Treasury) defined "fine or similar penalty" as an amount "paid as a civil penalty imposed by Federal, State, or local law, including additions to tax and additional amounts and assessable penalties...." 26 C.F.R. § 1.162–21(b)(ii) (1989). Courts should defer to agency interpretation so long as it is reasonable and consistent with the purpose of the statute. *United States v. Vogel Fertilizer Co.*, 455 U.S. 16, 26, 102 S.Ct. 821, 828, 70 L.Ed.2d 792 (1982).

■ Plaintiffs have not shown that Treasury's interpretive regulation for § 162 is unreasonable. Rather, both parties have cited legislative history for the proposition that § 162 denies deductions for penal assessments. The parties also agree that taxpayers may deduct assessments which operate merely as service charges for the administrative inconvenience of late filing.

In sum, plaintiffs cannot use the § 165 theft loss deduction if other provisions of the Code prohibit a tax benefit. The IRS levied the assessment at issue under § 6651(a)(2) of the Code because Communications did not pay taxes on time. The interpretive regulation for § 162 categorically precludes deduction for a penal sanction. Consequently, if § 6651(a)(2) is a penalty within the meaning of § 162, plaintiffs cannot use the theft loss provision of § 165.

Congress enacted § 6651(a)(2) in 1969. In post-enactment legislative history, the Senate Finance Committee explained that it "did not intend to liberalize the law in the case of fines and penalties." S.Rep. No. 437, 92d Cong., 1st Sess. 74 (1971). Thus, to determine whether subsection (a)(2) is a

penal sanction, this court must look to the fines and penalties provision in existence at the time of the 1969 amendment.

The operative penalty provision predating the 1969 amendment was § 6651(a)(1), which imposed an addition to tax for failure to file a return. The Supreme Court characterized that assessment as a civil penalty which resembled criminal sanctions for failure to pay taxes. *Spies v. United States*, 317 U.S. 492, 495–96, 63 S.Ct. 364, 366–67, 87 L.Ed. 418 (1943). Speaking of the penalties for failure to make a return, the Court remarked that "[p]unctuality is important to the fiscal system, and these are sanctions to assure punctual as well as faithful performance of these duties." *Id.* at 496, 63 S.Ct. at 367. In other words, civil assessments that enforce timely tax return filings are penalties. The § 6651(a)(2) assessment levied on plaintiffs is in fact a penal sanction rather than a service or finance charge.

Furthermore, the penalty assessment has the characteristics of a penal sanction. The assessment is not a flat fee for late filing. Rather, the assessment injects a punitive element by tying the assessed amount to the size of tax liability and the length of delay.

As a penal sanction, subsection (a)(2) cannot be the subject of a deduction under § 162. Because § 162 prohibits the deduction, § 165 by its terms precludes characterizing the penalty as a theft loss.[6] Thus, as a matter of law, plaintiffs cannot claim the $59,145.87 penalty as a theft loss deduction.

## CONCLUSION

Plaintiff may well be correct that the corporation did not effectuate the sale of the radio stations at issue. Plaintiffs have, during the course of this motion, presented persuasive evidence in support of its position. However, because this court must resolve doubts and ambiguities in favor of

---

6. Although employee embezzlement may have caused the late filing, plaintiffs still cannot claim a theft loss. This equitable consideration was relevant at the administrative stage. Plaintiffs could have appealed to the District Internal

Revenue Service Director under § 6651(a)(2) of the Code to demonstrate reasonable cause why the penalty should not have been assessed. Plaintiffs chose not to avail themselves of this procedure.

the nonmovant, it cannot reach summary judgment on this issue.

Here, the parties dispute the weight and character of evidence regarding whether Communications or shareholders effected the sale of radio stations. The parties view the facts differently and rely on different evidence to reach conflicting conclusions. Thus, this court must deny plaintiffs' motion for summary judgment.

As a matter of law, however, the assessment levied on plaintiffs is a non-deductible penalty under § 162 of the Code. As a consequence, plaintiffs cannot deduct the assessment as a theft loss under § 165. This court therefore grants defendant's partial motion for summary judgment.

Trial shall be held from June 26, 1990 at 9 a.m. through June 27, 1990, at the National Courts Building in Washington, D.C.

At trial, the parties shall be prepared to address a single issue: Did the corporation or the shareholders effect the sale of the radio stations at issue?