**ELASTOMERIC ROOFING
ASSOCIATES, INC.,
Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 177–89C.

United States Claims Court.

Aug. 20, 1992.

Sam Zalman Gdanski, Spring Valley, N.Y., attorney of record, for plaintiff.

Linda M. Samuel, Dept. of Justice, Civ. Div., Commercial Litigation Branch, Washington, D.C., with whom were David M. Cohen, Director, John W. Showalter, Asst. Director and Stuart M. Gerson, Asst. Atty. Gen., Attorneys of Record for defendant; Major Peter J. Comodeca, Dept. of the Army, of counsel.

## OPINION

HORN, Judge.

This case is before the court on defendant's motion for summary judgment. Plaintiff, Elastomeric Roofing Associates, Inc. (ERI), challenges the contracting officer's final decision, which denied the plain-

---

tiff's claim for an equitable adjustment to its roofing contract with the Department of the Army. Plaintiff's vague, one and one half page complaint, and its almost as brief response to defendant's motion for summary judgment [1], appears to allege that the government altered the specifications for three tasks called for under the contract, resulting in increased costs to ERI. Giving the plaintiff every benefit of the doubt, these alleged changes to the contract specifications appear to include a disagreement as to the requirement(s) on the type of roof coating product to be employed, the government's order to do additional work by requiring the plaintiff to apply more than the stated one-inch minimum of foam, and the cleaning of drains in addition to those required to be cleaned under the contract.[2] After consideration of the papers submitted by both parties, the arguments presented orally to the court, and for the reasons stated below, the court, hereby, GRANTS the defendant's motion for summary judgment.

### FACTS

Plaintiff, Elastomeric Roofing Associates, Inc. (ERI), is a corporation organized under the laws of the State of New Jersey. On December 9, 1986, ERI was awarded Contract No. DABT 47–87–C–9526 in the amount of $433,943.00, for the re-roofing of Buildings 5422 and 5482 at Fort Jackson, South Carolina.

The contract specified the required physical properties and performance qualities for the roof coating system in paragraph 2.3 of section 07540, as follows:

2.3 PROTECTIVE COATING SYSTEM shall be a *single-component* urethane rubber elastomeric membrane consisting of a base coat, black in color and 26 mils average in thickness and a top coat, white or light gray in color and 12 mils average in thickness and shall meet or exceed the following performance characteristics: * * * (emphasis added).

---

1. The plaintiff's response to the defendant's motion for summary judgment is basically an introduction to an appendix of attached documents, without any case citations.

2. In his administrative denial of plaintiff's claim, it is these three items which the contracting officer addressed and denied.

The use of a single-component product apparently was chosen because of problems on earlier government jobs with controlling the ratio of the mixture of components in the field, when using a plural-component roofing product.[3]

According to the deposition testimony of Stanley Betts, the former president and general manager of ERI, who was responsible for contracting work at ERI, when it bid on the roofing contract, plaintiff had no single-component roof coating product in mind for use as required under the contract. Instead, when it bid on the contract, it appears that ERI was planning to use a plural-component product called Chem–Elast,[4] or, as plaintiff indicated in the record, it also thought of submitting for approval a product called Polybrane 186.[5] The plaintiff claims that it did not want to use a roofing product called Neogard because, plaintiff maintains, Neogard is not a single-component roof coating system since it requires an activator or catalyst for use. Mr. Betts, however, admitted that another reason ERI did not want to use Neogard was because ERI was not a Neogard approved applicator at the time. By letter dated January 15, 1987, ERI requested that the contracting officer furnish the plaintiff with the names of three acceptable coating manufacturers. The contracting officer responded by advising that the government is not permitted to recommend suppliers.

The record demonstrates that the Army never changed its requirements during the bidding of the contract, or during the time that the contract was in effect. In fact, in its answer to defendant's interrogatories, submitted as part of the Appendix to defendant's motion, ERI confirms that the contract specifications were never changed. According to ERI, "there was no specific date when the contracting officer increased the coating system specification requirement under this contract. There was never a [sic] increase in this specification." ERI finally proposed to the government that it wished to use Brin–Mont or Neogard. On April 10, 1987, Neogard was accepted by the Army as a product which met the contract specifications.[6]

ERI did not notify the government that it regarded the refusal to allow it to use Chem–Elast as a constructive change to the contract until it filed a claim for equitable adjustment. According to the affidavit signed by the contracting officer, Donald Mulder, "[a]t no time prior to the receipt of the letter dated June 22, 1988 (uncertified) or August 17, 1988 (certified) did I receive any required notice from the Contractor that it regarded changes to have been ordered as made, or that it claimed an equitable adjustment." Nor did ERI argue contemporaneously that Chem–Elast is an equal or better product to that required in the contract specifications, as plaintiff is attempting to do now.

The re-roofing specifications in the contract, paragraph 3.4.3 of section 07540, as revised by amendment P00001, required ERI to apply at least one inch of foam to all surfaces.[7] The contract further speci-

---

3. A single-component product is one which is premixed in the controlled environment of the manufacturing plant, and which does not change its physical properties when applied. A plural-component product is one with two or more chemicals, which may or may not require a catalyst (a substance which causes or accelerates a chemical change without being affected by the reaction), and which, when combined at the job site, creates a new final product.

4. Information submitted to the government by the manufacturer clearly indicates that Chem–Elast did not meet the contract specifications. The record indicates that Chem–Elast is a two-component elastomer, the elongation tensile strength of which did not satisfy the government's requirements for the membrane of the protective coating system.

5. Polybrane 186, however, had problems meeting the contract tensile requirements and had sustained many failures in the past.

6. In a declaration submitted by William R. Frazier, an architect employed in the Design Branch of the Engineering Division of the Directorate of Engineering and Housing of the Army, who was the project manager for the contract at issue, he indicated that he would not have approved Chem–Elast for the project.

7. 3.4.3 *Urethane Foam* shall be sprayed on the prepared surface to a minimum thickness of 1 inch. Thickness of foam shall be varied to insure proper drainage. Foam shall be applied in ½ inch lifts. Weather for installation (industry recommendations): when relative humidity is less than 85%; when dew point is more than

fied that the Army could order more foam to be applied for a variety of specified reasons, including to insure proper drainage. Moreover, the foam was to be applied to insure that the final surface would appear "neat" and watertight, as specified under section 07540, paragraph 3.1.1 of the contract.[8] Additional details regarding application of the coating are also contained in other paragraphs of section 07540, including 3.4.4, 3.4.4.1, 3.4.4.2, 3.4.5, and 3.4.5.1. Pursuant to paragraph 3.6 of contract section 07540, ERI was also to be held responsible for any additional work required after inspection to meet the contract specifications.[9]

On August 5, 1987, Gene Jones, the government construction inspector, noted defects in ERI's application of the foam. According to Mr. Jones, ERI did apply additional foam as he directed. At the time, however, ERI did not protest the deficiencies pointed out by Mr. Jones, nor did they seek a clarification from the contracting officer. Moreover, at no time prior to the filing of ERI's claim for an equitable adjustment with the contracting officer (the uncertified claim of June 22, 1988, or the certified claim of August 17, 1988) did ERI notify the contracting officer that, as a result of not being allowed to use Chem–Elast, and as a result of Mr. Jones' direction to increase the amount of foam to be applied, ERI would take the position that there had been a constructive change to the provisions of the contract. In fact, in a response to an interrogatory posed by defendant during discovery, ERI admitted that the contracting officer was not aware that Mr. Jones had directed ERI to increase the thickness of the foam.

Pursuant to section 3.4.7 of the contract, ERI was required to inspect all roof drains for cracks and leaks, and to make repairs as required before beginning any work.[10] Then, upon finishing the roofing work, the contractor was required to return the property of the government to "its original or better condition at no additional cost to the Government."[11] Furthermore, the con-

5 degrees F below substrate surface temperature; when substrate temperature is 60 degrees to 120 degrees F. Wind speeds should be less than 12 mph; the substrate should be dry. Time between lifts should not exceed 4 hours to prevent ultra-violet deterioration. The finished surface shall be of an 'orange peel' texture and free of voids, crevices and pinholes. Foam with surface condition known as 'tree bark' or 'popcorn' shall be removed and replaced or ground down at the Contractor's expense. High places or extremely uneven surfaces which cause ponding of water or prevent proper drainage shall be ground down at the Contractor's expense. Foam shall be extended up walls and around roof projects to form cants and flashings that terminate at least 2 inches above finished roof surface, or as shown on drawing. Foam shall be cured and free from water, dust, oils and other materials which would impair adhesion of coating. No foam shall be allowed to stand overnight without a base protective coating. Foam shall cure at least one hour before application of protective coating.

8. 3.1.1 *Summary of Work:* Where existing flued applied roofing repair work has been turned up on abutting masonry walls and parapets the repair work shall be reworked and refinished to the extent needed to provide a final surface which is neat and will keep the building watertight.

9. 3.6 QUALITY ASSURANCE INSPECTION: .... Roof surfaces will also be inspected by the Contracting Officer for texture, blisters, nonadherence to substrate, thickness and other defects. Should these tests or inspections by Contracting Officer indicate the required thicknesses are not being achieved, or other requirements of the drawings and specifications are not being met, the Contractor shall provide additional work until contract requirements are met....

10. 3.4.7 *Roof Drains:* Before any re-roofing work is started on any part of the roof, the Contractor shall check all roof drains for cracks and leaks, and shall repair them. Before any re-roofing work is started on a part of the roof, the Contractor shall remove the strainer from roof drains and put a cover over them so no materials can get into the drain piping during repair work. The Contractor shall remove the cover and replace the strainer at the end of each day's work, and remove again at the start of the next day's work. At the end of the project, the Contractor shall replace all broken or missing strainers with new strainers.

11. 1.3 *Contractor Responsibilities:* The Contractor shall provide an applicator's License Certificate issued by the Manufacturer (the manufacturer of primary products of the roofing system). Damages to Government property resulting from the roofing operation shall be the responsibility of the Contractor to return to its original or better condition at no additional cost to the Government.

tract required that upon the completion of each roof, all areas around the buildings were to be left in a clean condition.[12]

On February 9, 1988, as the contract performance neared completion, ERI was advised of the items under the contract which remained to be corrected, including cleaning of eight clogged drains. A dispute between the plaintiff and defendant arose regarding how many drains ERI was responsible to clean under the contract. ERI admitted that it was responsible for eight of twenty-five clogged drains. According to the contracting officer's final decision:

> The evidence shows that the inspector did show ERI employees which eight drains were to be unclogged by the company by providing the two explanatory drawings. The inspector denies that he directed ERI employees to clean 25 drains. In fact, drain drawing two shows that only 20 drains were clogged, when it was made. The evidence raises a question as to whether there were 25 clogged drains to clean.

ERI claims that it did not know which eight drains it was required to clean because, when he left the company, a former ERI vice president and project supervisor had taken with him the drain diagrams which could have shown those drains still needing to be cleaned. Despite ERI's alleged concerns, Valerie Attara, ERI's president, directed her employees to clean all twenty-five drains. Ms. Attara said in her deposition, which is included in the record, that she gave the instruction to clean all twenty-five drains as a business decision, in order to expedite completion of the project. As in the case of the type of foam to be used in the project and the foam thickness to be applied, at no time did ERI seek clarification from the contracting officer of

what ERI considered a change to the terms of the contract, nor did it notify the contracting officer of ERI's decision to clean all twenty-five drains.

In addition, ERI has produced no documents to substantiate any of its alleged increased expenditures for labor or material for any of the three claims. Furthermore, although ERI has alleged that the company kept payroll records, time sheets, invoices and job costing cards, there is conflicting testimony as to whether the records, which are necessary to document plaintiff's claim, were actually ever kept, or, whether ERI has any of the document's in its possession. For example, during the deposition of Mr. Betts, he offered conflicting testimony on whether daily reports actually were kept throughout the project. In addition, ERI further indicated that, although they did find some boxes, the contents of which remain undescribed in the record, some of ERI's records were destroyed by a fire, or lost in one of their moves.

## DISCUSSION

Summary judgment in the United States Claims Court is properly granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Rule 56 of the Rules of the United States Claims Court (RUSCC) is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed. R.Civ.P.) and is similar in language and effect.[13] Both Rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RUSCC

---

12. 3.9 CLEAN UP: .... Upon completion of the work, all unused materials, containers, equipment, etc., shall be removed from the site. All surfaces that are strained, marred or otherwise damaged by work under this section shall be cleaned and repaired and all areas shall be left in a clean condition.

13. In general, the Rules of the United States Claims Court (RUSCC) are closely patterned

upon the Federal Rules of Civil Procedure (Fed. R.Civ.P.). Therefore, precedent under the Federal Rules of Civil Procedure is relevant to interpreting the Rules of the United States Claims Court, including Rule 56. *See Imperial Van Lines Int'l, Inc. v. United States,* 821 F.2d 634, 637 (Fed.Cir.1987); *Lichtefeld–Massaro, Inc. v. United States,* 17 Cl.Ct. 67, 70 (1989).

56(c); Fed.R.Civ.P. 56(c). Rule 56(c) of the Rules of the United States Claims Court provides that in order for a motion for summary judgment to be granted, the moving party bears the burden of showing that there is no genuine issue of material fact and is entitled to judgment as a matter of law. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Rust Communications Group, Inc. v. United States*, 20 Cl.Ct. 392, 394 (1990); *Lima Surgical Assoc., Inc. Voluntary Employees' Beneficiary Assn. Plan Trust v. United States*, 20 Cl.Ct. 674, 679 (1990), *aff'd*, 944 F.2d 885 (Fed.Cir.1991).

As stated in *Webster University v. United States*, 20 Cl.Ct. 429 (1990):

> An issue is genuine only if, on the entirety of the record, a reasonable jury could resolve a factual matter in favor of the non-movant, *see, e.g., Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1562 (Fed.Cir.1987), while the materiality of a fact is determined by reference to applicable legal standards. *Id.*, 833 F.2d at 1567.

*Id.* at 432 (emphasis deleted). Disputes over facts which are not outcome determinative under the governing law will not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Summary judgment will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.; see also Uniq Computer Corp. v. United States*, 20 Cl.Ct. 222, 228–29 (1990). The nonmovant must do more than merely raise some doubt as to the existence of a fact; the nonmovant must make a showing sufficient to require submission of the factual dispute to a jury or judge. *Avia Group Int'l, Inc. v. L.A. Gear California, Inc.*, 853 F.2d 1557 (Fed.Cir.1988).

Moreover, the facts presented must be viewed in the light most favorable to the nonmoving party. *Adickes v. Kress & Co.*, 398 U.S. at 147, 90 S.Ct. at 1602. If the moving party has carried its initial burden of showing that there is no genuine issue of material fact, then the nonmoving party bears the burden to present "specific facts showing that there is a genuine issue for trial." RUSCC 56(f); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 106 S.Ct. at 2510 (citing *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)); *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). The nonmovant "must proffer countervailing evidence sufficient to create a genuine issue of material fact". *Uniq Computer*, 20 Cl.Ct. at 228. The party opposing the motion must "prove by sufficient evidence that a genuine issue of material fact positively remains." *Spirit Leveling Contractors v. United States*, 19 Cl.Ct. 84, 89 (1989).

When making a summary judgment determination, the judge's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249, 106 S.Ct. at 2510, 2511; *see, e.g., Cloutier v. United States*, 19 Cl.Ct. 326, 328 (1990), *aff'd*, 937 F.2d 622 (Fed.Cir. 1991). The judge must determine whether the evidence presents a sufficient disagreement to require submission to fact finding, or whether it is so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 250–52, 106 S.Ct. at 2511–12. When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. at 587, 106 S.Ct. at 1356. If, however, the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. As indicated above, any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *Id.; see also Litton Industrial Products, Inc. v. Solid State Systems Corp.*, 755 F.2d 158, 163 (Fed.Cir.1985); *H.F. Allen Orchards v. United States*, 749 F.2d 1571,

1574 (Fed.Cir.1984), *cert. denied,* 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

■ In *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the Supreme Court added an additional provision to the long standing summary judgment guidelines outlined above when it indicated that the initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged, if the moving party can show, alternatively, that there is an absence of evidence to support the nonmoving party's case. *Id.* at 325, 106 S.Ct. at 2553; *see also Lima Surgical Assoc.,* 20 Cl.Ct. at 679. If the moving party makes this showing, the burden is then on the nonmoving party to present evidence in support of its case and show that a genuine factual dispute exists by making a showing sufficient to establish the existence of an element of its case upon which it bears the burden of proof. *Id.* The logic behind this addition is simple. If under no scenario can the nonmoving party present the necessary evidence to support its case, then there should be no genuine need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings. Under Rule 56, the motion for summary judgment may be made by the moving party and succeed, whether or not accompanied by affidavits and other documentary evidence in addition to the pleadings already on file. Generally, however, in order to prevail, the nonmoving party will need to go beyond the pleadings, by use of evidence such as affidavits, depositions, answers to interrogatories and other admissions, in order to show that a genuine issue for trial exists. *Celotex v. Catrett,* 477 U.S. at 324, 106 S.Ct. at 2553. The type of evidence provided by the party opposing summary judgment need not meet the standards for admissibility at trial. The nonmovant, however, must produce evidence beyond the mere pleadings to survive the summary judgment motion and proceed to trial. *Id.*

Plaintiff's brief response to defendant's motion for summary judgment alleges that defendant's motion for summary judgment should be denied because there are material, contested facts in dispute. In a submission entitled "PLAINTIFF'S CONTESTED FACTS," the plaintiff offered the following as facts in dispute:

> Elastomeric Roofing Associates, Inc. was anticipating submitting an alternate to the specifications. Mr. Betts had thought of Polybrane 186, but had reservations because of the product's track record. It also did not meet specifications with regard to tinsel [sic] strength and PSI.
>
> Elastomeric Roofing Associates, Inc. does not recognize Neogard as a single component Urethane because of the addition of a catalyst.
>
> Mr. Betts' dispute with Polybrane had nothing to do with not submitting Polybrane 186. Polybrane 186 did not meet specifications on tinsel [sic] strength and PSI, and the fact that Polybrane has had many failures in the past.

In "Plaintiff's Opposition to Defendant's Motion for Summary Judgment", plaintiff, again in a somewhat confused fashion, relies on its answers to interrogatories to define its claims in slightly different terms:

> ★ "It is clear that plaintiff has characterized the government's failure to accept the or equal [sic] product of Chem–Elast as an improper action by the government."
>
> ★ "... [T]here was an increase of the original specification under the direction of the inspector, Mr. Jones. Elastomeric construes Jones' direction that more foam be applied, than the specifications called for to be an increase...."
>
> ★ "... Elastomeric pointed out that it cleaned twenty-five (25) drains when only eight (8) were clogged, because they could not receive the cooperation of procuring activity representatives to specify which drains specifically had to be cleaned."

Plaintiff's counsel reiterated the gist of his position at the oral argument on June 2, 1992, even after the court inquired as to which factual issues plaintiff's counsel con-

sidered in dispute. As is more fully discussed below, this court believes that none of the facts claimed by plaintiff to be material facts in dispute defeat defendant's motion for summary judgment.

Although none of the facts plaintiff's counsel listed as in dispute are clearly stated, giving the plaintiff, ERI, the benefit of the doubt, the court will address the possible issues in dispute, implicit in plaintiff's total package of filings. The issues which warrant discussion are whether the government issued one or more change orders when it: (1) required the use of Neogard instead of Chem–Elast; (2) directed plaintiff to spray additional foam, above the one-inch minimum specified in the contract; and (3) according to the plaintiff, directed it to clean twenty-five drains at the close of the project.

■ The applicable changes clause in the contract at issue is Federal Acquisition Regulation (FAR) clause 52.243–4,[14] which authorizes the contracting officer to make changes within the general scope of the contract, without engendering additional costs to the government. Under certain limited conditions the rule also sets out the ground rules for how a contractor can make a claim for additional payments beyond those provided for in the contract.

The following specific provisions are found in section 5 of the contract, titled "Special Contract Provisions":

\* \* \* \* \* \*

*Designation of Government Inspector.* The Contracting Officer will designate a representative for the purpose of technical surveillance of workmanship and inspection of materials for work being performed under this contract at the pre-performance conference. This provision in no way authorizes anyone other than the Contracting Officer to commit the Government to changes in the terms of the contract.

Moreover, in the notice to proceed, sent by the government to ERI on January 13, 1987, the contractor was specifically reminded that: "All work shall be performed in strict accordance with the terms of the contract. No changes in such work and no

---

14. FAR clause 52.243–4, titled *Changes* states:
  (a) The Contracting Officer may, at any time, without notice to the sureties, if any, by written order designated or indicated to be a change order, make changes in the work within the general scope of the contract, including changes-
   (1) In the specifications (including drawings and designs);
   (2) In the method or manner of performance of the work;
   (3) In the Government-furnished facilities, equipment, materials, services, or site; or
   (4) Directing acceleration in the performance of the work.
  (b) Any other written or oral order (which, as used in this paragraph (b), includes direction, instruction, interpretation, or determination) from the Contracting Officer that causes a change shall be treated as a change order under this clause; *provided,* that the Contractor gives the Contracting Officer written notice stating (1) the date, circumstances, and source of the order and (2) that the Contractor regards the order as a change order.
  (c) Except as provided in this clause, no order, statement, or conduct of the Contracting Officer shall be treated as a change under this clause or entitle the Contractor to an equitable adjustment.
  (d) If any change under this clause causes an increase or decrease in the Contractor's cost of, or the time required for, the performance of any part of the work under this contract, whether or not changed by any such order, the Contracting Officer shall make an equitable adjustment and modify the contract in writing. However, except for a 'proposal for adjustment' (hereafter referred to as proposal) based on defective specifications, no proposal for any change under paragraph (b) above shall be allowed for any costs incurred more than 20 days before the Contractor gives written notice as required. In the case of defective specifications for which the Government is responsible, the equitable adjustment shall include any increased cost reasonably incurred by the Contractor in attempting to comply with the defective specifications.
  (e) The Contractor must submit any proposal under this clause within 30 days after (1) receipt of a written change order under paragraph (a) above or (2) the furnishing of a written notice under paragraph (b) above by submitting to the Contracting Officer a written statement describing the general nature and amount of proposal, unless this period is extended by the Government. The statement of proposal for adjustment may be included in the notice under paragraph (b) above.
  (f) No proposal by the Contractor for an equitable adjustment shall be allowed if asserted after final payment under this contract.
48 C.F.R. 52.243–44 (April 1984).

additional work may be performed by you without a change order or supplemental agreement signed by the Contracting Officer in advance."

■ It is a well settled principle that the "government is entitled to obtain precisely what it contracts for as long as it does not mislead the contractor." *Rixon Electronics, Inc. v. United States*, 210 Ct.Cl. 309, 320, 536 F.2d 1345, 1351 (1976); *see also American Elec. Contracting Corp. v. United States*, 217 Ct.Cl. 338, 350, 579 F.2d 602, 608 (1978); *Octagon Process, Inc. v. United States*, 141 Ct.Cl. 599, 604 (1958); *Farwell Co. v. United States*, 137 Ct.Cl. 832, 148 F.Supp. 947 (1957); *Henry Spen & Co. v. United States*, 139 Ct.Cl. 613, 153 F.Supp. 407 (1957). Or, stated differently, "the government has a right to insist on the contractor's compliance with the specifications, regardless of its reasons." *Farwell Co. v. United States*, 137 Ct.Cl. at 836, 148 F.Supp. at 949; *see also American Elec. Contracting Corp. v. United States*, 217 Ct.Cl. 338, 350, 579 F.2d 602, 608 (1978). Strict compliance with government specifications is important in order to insure that a contractor does not gain an advantage in the bidding process by the use of different products. *Farwell Co. v. United States*, 137 Ct.Cl. at 836–37, 148 F.Supp. at 949–50; *see also Peters v. United States*, 694 F.2d 687, 695 (Fed.Cir.1982); *Cascade Pacific Intern v. United States*, 773 F.2d 287, 291 (Fed.Cir.1985).

The predecessor to this court, the United States Court of Claims, explained the applicable principles clearly in *Farwell Company v. United States*, as follows:

> The Government has stated in its brief that it does not contend that the copper tubing was not suitable. It does say that it did not conform with the requirements of the contract specifications, and quite obviously it did not. It is of no concern to plaintiff why the Government specified brass or copper 'pipe' instead of 'tubing,' and it was not within plaintiff's province to substitute its judgment for that of the Government by deciding that tubing was satisfactory when pipe was specified. The Government may have

had many reasons for requiring pipe instead of tubing, but in any event the specifications called for pipe and the Government had a right to expect that pipe would be used. In other words, why have a contract if either party could change the terms thereof to suit his particular whim. The easier method would be to say 'just build us a good building,' then leave it up to the court in the inevitable ensuing lawsuit to determine whether the materials used were suitable. This is just what contracts are meant to prevent and an added reason why they could be construed according to their terms, as this court did in its decision on the cross-motions for summary judgment.

*Farwell Co. v. United States*, 137 Ct.Cl. at 836, 148 F.Supp. at 949.

There is no language in the contract in issue which would have allowed ERI to substitute a plural-component product for the single-component product specified in the contract. As stated in *H.L.C. & Associates Construction Company v. United States:* "It is not within his [the contractor] province to decide what materials are equally satisfactory and substitute his judgment for that of the Government." *H.L.C. & Associates Constr. Co. v. United States*, 176 Ct.Cl. 285, 306, 367 F.2d 586, 598 (1966). Contract section 2.3 specifically calls for "a single-component urethane rubber elastomeric membrane." Therefore, a plural-component product is not within the scope of the contract.

The plaintiff could have had no doubt that the contract specifications required use of a single-component product, and that the government never deviated from that position. In fact, in its answers to the defendant's interrogatories, which are part of the record before the court, ERI clearly admits that the government never made a change to the roof coating system specifications. Significantly, at one point in his deposition, Mr. Betts, the former president and general manager of ERI, stated that he may have bid the contract using the unapproved product Chem–Elast, which

may have accounted for the increase in price now claimed by the plaintiff ERI.

ERI ultimately submitted the foam Neogard [15] for approval, and the Army accepted Neogard as appropriate under the contract specifications. Once ERI proposed to the government that it use Neogard, and once the government approved the use of Neogard, the plaintiff could not continue to choose new materials, or to claim that the use of Neogard would result in any additional liability to the government beyond the terms of the contract.

Plaintiff maintains that by offering Chem–Elast it was offering an equal or better product, and, therefore, an acceptable product. The contract at issue, however, contained no "equal or better" clause. Even if the contract had contained such a clause, however, Chem–Elast is not a product equal to Neogard. Chem–Elast's elongation and tensile strength did not meet the government's requirements. And, as discussed above, Chem–Elast is not a product equal to Neogard because it is a plural-component, not a single-component product.

Regardless, ERI had no contractual right to substitute a roofing product of its own choosing. This court has previously endorsed the principle that the government is entitled to strict compliance with contract specifications and that the government does not even have to accept something better than that which it contracted to receive. *See Design & Production, Inc. v. United States*, 18 Cl.Ct. 168, 216 (1989) (citing *Good Constructing Co.*, 86–2 B.C.A. (CCH ¶ 18,912 (March 25, 1986)). Likewise, the court is under no obligation to evaluate whether an alternative product is adequate for the purposes intended under the contract. It should be assumed that the government had a rational basis for its decision, and, in the instant case, the government appears to have been motivated by a fear of product failure, which could occur from on-site mixing of plural-component products.

In fact, the government even has the right to make a mistake in contract specifications, provided the mistake is not in violation of legal requirements. As stated in *Ralph Larsen & Son, Inc. v. United States*, "the government may require performance both in excess of, or below, the standard normally accepted in the trade." *Ralph Larsen & Son, Inc. v. United States*, 17 Cl.Ct. 39, 46 (1989). Neither party to this lawsuit has argued that the contract specifications are ambiguous or unclear. Consequently, this court endorses a long-standing proposition that trade practices in the industry should not be allowed to override an unambiguous contract provision. *S.S. Silberblatt, Inc. v. United States*, 193 Ct.Cl. 269, 288, 433 F.2d 1314, 1323 (1970).

It should also be noted that plaintiff's claims in this lawsuit are not entirely consistent. On the one hand, plaintiff alleges that there was a change order generated by the government's refusal to accept, or even to evaluate the product Chem–Elast, tendered by the plaintiff. On the other hand, plaintiff admits that at no time did the government issue a change to the contract regarding the single-component nature of the contract requirements. To make matters more confusing, if ERI truly had considered the government's refusal to accept Chem–Elast as a change to the contract, plaintiff, should have complied with the changes clause of the contract, which it did not.

Even if plaintiff could demonstrate that a change to the contract terms regarding the single-component roofing product had occurred, which it clearly cannot, in order to prove a constructive change to the contract, ERI would still have to prove that its increased costs were outside the scope of the contract and the result of the Army's actions or orders to perform

---

**15.** Although ERI argues that it does not recognize Neogard as a single-component product because heat is necessary in its use, beyond a mere assertion, the plaintiff has presented no evidence to show that Neogard is any thing but a single-component product as claimed by its manufacturer, nor that Chem–Elast, the product plaintiff tried to offer, is other than the plural-component product, as described by its manufacturer.

additional work. To recover under a changes clause, for either an express or constructive change, the contractor must show that a change occurred and that it was ordered by a government officer having the requisite authority. *Chalker & Lund Company v. United States*, 123 Ct. Cl. 381, 107 F.Supp. 734 (1952); *see also, Big Chief Drilling Company v. United States*, 15 Cl.Ct. 295, 300 (1988); *Lens Company & Associates v. United States*, 181 Ct.Cl. 29, 38–39, 385 F.2d 438, 443 (1967). Once again, plaintiff cannot meet the articulated test. During the pretrial discovery, when asked to produce all relevant documents, ERI was unable to produce proof that its increased costs were attributable to government action since both parties agree that the Army did not change its requirements.

■ Plaintiff's second claim demands payment for additional labor costs expended in order to comply with government direction to apply more than the minimum one inch of foam required under the contract. The Army claims that the additional foam was necessary to provide proper drainage and meet the other requirements of the contract. The plaintiff responds that the demand to apply additional foam was for aesthetic purposes only. According to the plaintiff, it had sprayed sufficient foam to meet the contract specifications, and that proper drainage was not the issue.

Plaintiff's claim appears to be best set out in selections included in the record from the deposition testimony of ERI's Betts, who stated as follows:

A. ....

It [the roof] was sealed, it was watertight, as the specifications called for. Mr. Gene Jones came out to inspect the job. He liked the basic design of the roof that we were doing, but he pointed to those areas in the corner and said that he didn't like that because some of the areas the foam would roll, the irregular shapes of the parapet wall and the shape of the foam that was on it, you would. have waviness on it and it would wave, and it came back and then it came back

out onto the roof area and you could stick your hand there and your fingers could go in maybe a half inch or so, but it was sealed.

Mr. Jones wanted that brought out flush and smooth. To do that we had to spray two or three inches into this area here, bring the foam up higher up the wall and make a curve cant. This way no water would lay in that corner and it would be, you know, much smoother and it would take out that little indentation there.

\*     \*     \*     \*     \*     \*

Q. And didn't the contract also require that the final surface be neat and insure proper drainage.

A. Yes, but we are not talking about drainage here. They are talking about the main part of the roof. This is the parapet wall. There's—there was no drainage on the parapet wall.

\*     \*     \*     \*     \*     \*

Q. So can you explain exactly what your claim is with respect to the parapets?

A. We had to put additional material where the parapet wall and the roof join for aesthetic reasons. (Betts 38)

\*     \*     \*     \*     \*     \*

Q. Did you indicate at any point in time during those conversations that you regarded that as a change order to the contract.

A. Yes, I told him it was going to cost us a lot of money to do it that way, and he told me that he's the one to accept the job and if we want to get paid, we do it the way that he would like it.

Q. And you recall stating that Elastomeric regarded this as a change order?

A. Yes. We need a change order to change it right there. I told him it was going to be extra, if that's what you classify as a change order.

Q. You said it was going to cost Elastomeric extra money or that you regarded it as a change to the specifications in the contract?

A. I told him it would cost more money to the government to do it because it was

not the way the specifications called for, and he brought out the prints and we went over it and I showed him, you know, how it came down the wall and followed the contour of what was there, and he said, "You do it the way I would like."

The plaintiff's answer to interrogatory number 2, however, conceded that it was the inspector and not the contracting officer who increased the specifications. As written by plaintiff: "There was no action by the contracting officer because I believe he knew nothing about this deviation from the specifications."

Although Mr. Betts may have told Mr. Jones that the extra foam would constitute a change to the contract and cost more money, it is clear that plaintiff failed to submit a written claim for additional costs to the contracting officer, as required by the changes clause of the contract. The project inspector, Jones, who requested the application of more foam, was not a government representative authorized to modify the contract. Unauthorized actions by an inspector, who is not the contracting officer, and who is not authorized to order changes to a contract, cannot legally bind the defendant to additional monetary obligations. As the court in *Chalker & Lund Company v. United States* wrote:

Defendant says further, and this is its chief defense, that regardless of the terms of the understanding between plaintiff and the area engineer, the latter had no authority to make such an agreement, and that in no event can it be held binding upon the Government.

This position is well taken. Although the area engineer may have been the authorized representative of the contracting officer for certain limited purposes under the contract, there is no indication either in the contract or elsewhere of any authority in the area engineer, without approval of the contracting officer, to so amend the contract itself by an agreement of this sort.

Not only was the agreement not reduced to writing, the man who did have such authority, the Government's con-

tracting officer, did not know of it until long after it was made.

*Chalker & Lund Company v. United States*, 123 Ct.Cl. at 407–8.

David Mulder was the authorized contracting officer for the government on the contract in suit. Under the changes clause, FAR 52.253–4, incorporated into the contract, it was Mr. Mulder, the contracting officer, who was authorized, in accordance with procedures articulated in the contract, to approve changes to the contract which could increase the government's liability. Both plaintiff and defendant agree that Mr. Mulder did not know about any of the extra work performed for which the plaintiff now seeks additional compensation, that there was no written change order, and that Mr. Mulder first became aware of plaintiff's claim to additional compensation when the plaintiff filed its uncertified claim, followed by its certified claim.

Under the changes clause, FAR 52.253–4, the burden was on the plaintiff to obtain approval for any changes from the contracting officer in a timely fashion and in writing. *See General Bronze Corporation v. United States*, 168 Ct.Cl. 176, 187–90, 338 F.2d 117, 123–25 (1964); *The Woodcraft Corporation v. United States*, 146 Ct.Cl. 101, 103, 173 F.Supp. 613, 614 (1959). ERI never petitioned the contracting officer for formal approval for any changes to the contract. At the time of performance, the plaintiff proceeded with spraying the additional foam without any protest. Moreover, the contracting officer did not receive any notice of the claim until ERI's claim for equitable adjustment was filed, well after the thirty-day period following performance. The failure of the plaintiff to follow the appropriate steps outlined in FAR clause 52.243–4 is fatal to its claim.

The court also notes that even if plaintiff's claim had been properly presented, in an answer to an interrogatory put forth by defendant, which is part of the record before this court, plaintiff, ERI, responded that it did not keep daily reports. Therefore, it appears plaintiff would be unable to prove on which day it added additional foam or what were its costs for that effort.

For example, regarding one eight thousand dollar claim on the extra foam applied by ERI, Stanley Betts testified in his deposition: "I don't remember how we calculated it. I don't know if there's records or if we just—I don't know. I can't really say." It is clear that the plaintiff apparently did not keep reliable, daily reports of the foam application work but sought refuge in an assertion that the government, through Mr. Jones, had told them that "no unnecessary paper work was required." The record, therefore, raises the distinct possibility that, despite the possible loss of some of the records in an alleged fire, even if this case were to go to trial, the plaintiff might not possess sufficient records to substantiate its claims.

■ Finally, the plaintiff claims it is entitled to an equitable adjustment for the cleaning of seventeen additional drains, allegedly not required by the contract specifications. Both parties agree that under the contract terms ERI was responsible for cleaning eight clogged drains. ERI points to the lack of guidance regarding which additional drains remained to be cleaned under paragraph 3.4.7, the requirement to clean those drains as the basis for finding a change to the contract. After some dialogue between ERI officials and Mr. Jones, Valerie Attara, the president of ERI, directed that all twenty-five drains be cleaned. According to the deposition testimony of Ms. Attara:

> No one from the Army told me that we were responsible for cleaning twenty-five drains.... Well, if no one was going to help me find the eight drains that were clogged, and I was—I had men down there for I don't know how many days trying to find out which eight drains were clogged. It was much easier for me to say 'clean the twenty-five drains and get out, come home and forget about the whole thing.'

Although, ERI has claimed that certain records, which might have explained the drain status, were retained by a former vice president when he left the company, there is no evidence to show that plaintiff made any attempt to obtain such records.

As in the case of the other claims urged by the plaintiff, ERI failed to obtain approval for any changes to the contract from the contracting officer. In addition, no claim by ERI regarding the drains was submitted to the contracting officer prior to submission of the claim for an equitable adjustment, which was well after thirty days following drain cleaning. It is also clear that based on the statement of ERI's president, Attara, no government official ordered ERI to clean twenty-five drains, and that she volunteered and ordered the twenty-five drains to be cleaned on her own initiative. Consequently, no constructive change to the contract could have occurred. *See Big Chief Drilling Co. v. United States*, 15 Cl.Ct. at 300; *Lens Company & Associates v. United States*, 181 Ct.Cl. at 38–39, 385 F.2d at 443.

## CONCLUSION

On each of the three claims presented by ERI, plaintiff has offered little, if any, substantiation to support its claims that it should be reimbursed for additional costs. The record contains bald allegations of increased costs and unsubstantiated claims of alleged changes to the contract by the government. In addition, it appears that even if this court were to find liability on the part of the defendant, the plaintiff would likely be unable to prove damages. At her deposition, which was submitted as part of the record, the following colloquy occurred between defendant's counsel and Valerie Attara, owner, president and sole corporate officer of ERI, and is instructive on this issue:

> Q. As you sit here today, can you identify what documents Elastomeric has in its possession that substantiates these claims?
>
> A. As of right now, I don't have any documents.
>
> Q. My question is not did you bring them with you today. My question is as you sit here today, do you know of documents that exist to support these claims?
>
> A. I would have to say that I would have to go and find a price list from Neogard, a price list from Chem–Elast.

I couldn't find any payroll records, as I stated before. You know, I've looked practically everywhere that I could possibly think of looking.

Therefore, for the reasons discussed above, the court finds that the government either did not authorize changes to the contract, or, in fact, no such changes occurred. Moreover, the plaintiff contractor certainly failed to follow the proper procedures set forth in the contract, by which changes to the contract could be effected. The court, therefore, GRANTS the defendant's motion for summary judgment. The Clerk of the Court is, hereby, directed to issue a judgment dismissing the complaint.

IT IS SO ORDERED.